Alireza Rabie JAHED; Maryam Feizi; Labon Rabie Jahed; Tansagol Rabie Jahed, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 02–70487.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 2003.

Filed Jan. 20, 2004.

---

Reza Athari, Immigration Law Offices of Reza Athari, Las Vegas, NV, for the Petitioner.

Christine A. Bither, U.S. Department of Justice, Washington, DC, for the Respondent.

Shelley Goad, U.S. Department of Justice, Washington, DC, for the Respondent.

Before: B. FLETCHER, KOZINSKI, and TROTT, Circuit Judges.

Opinion by Judge TROTT; Dissent by Judge KOZINSKI.

TROTT, Circuit Judge:

Alireza Rabie Jahed ("Petitioner"), his wife, and their two children (collectively "Petitioners") petition for review of the Board of Immigration Appeals's ("BIA") order denying their motion to remand and dismissing their appeal of an Immigration Judge's ("IJ") order denying their respective asylum applications. We have jurisdiction under 8 U.S.C. § 1252(a), and we grant the petition.

## BACKGROUND

### A.

Petitioners [1] are citizens of Iran who applied for asylum in the United States on

---

**1.** Because the petitions for Jahed's wife and children are dependent on his petition, the remainder of this opinion will discuss the proceedings by referencing only Petitioner Jahed.

the grounds (1) that Petitioner Jahed had been the target of persecution by a soldier of the Iranian Revolutionary Guard, known as the "Pastars," and (2) that he fears dire consequences at the hand of the Iranian Government should he be forced to return. He alleges that his past persecution as well as his fear of future persecution stem from his involvement with the Mojahedin, a rival political group disfavored by the current government. In his asylum application, he described his association with that group as follows:

Q. 34 I belonged to the Mojahdeen (sic), 1981–85; the purpose of this group was to establish an impartial system of justice with the removal of torture and unwarranted executions, which involves the removal of current political leaders. My responsibilities included distribution of newsletters and scheduling of meetings. This is a banned opposition organization; the regime has openly stated that all members of this group shall be killed.

Q. 35 I have been a member of a banned opposition organization. I organized meetings and distributed literature. Our purpose was removal of the current regime and an end to torture, executions and human rights abuses. The regime has ordered that members of this group shall be killed.

Q. 44 In October 1990 one of the Pastars (Revolutionary Guard) recognized me and threatened me. He told me that if I didn't pay him 200,000 Toomans he would report me to the authorities. I didn't have the money, and in any event he would have turned me in whether or not I paid, so I had to flee immediately with my family. A similar incident had occurred to a friend, Cyrus Yaghley of Tehran; he was similarly blackmailed by the Pastars, didn't pay, and was imprisoned with his entire family in Tehran in 1987 and has not been heard of since. We fled to escape the same fate.

Jahed's testimony generally elaborated on this information in his application and added detail to it, as we will discuss later.

The State Department's relevant country report of August 1997 describes the Mojahedin and its hostile relationship to Iran's current government as follows:

The Mojahedin organization is one of the most active militant Iranian opposition groupings with a world-wide network of members and supporters. Known or suspected members of this organization face either execution or long prison terms if caught in Iran. Leaders of the Mojahedin living in exile have been targeted by the regime for assassination and kidnapping.

The Revolutionary Guard, or the Pastars, are well known to us. Our State Department has identified the group to which Jahed's alleged persecutor belonged as a "military force established after the revolution" that is "responsible for internal security." Using the Department of State's Iran Country Report on Human Rights Practices for 1997 as a source, we published in one of our cases the following description of their arbitrary activities on behalf of the Iranian government:

Political arrests are made by members of the Revolutionary Guard or, less commonly, by members of the komiteths, local neighborhood groups which have assumed a quasi-official role. No judicial determination of the legality of detention exists in Iranian law. ... Suspects are held for questioning at local Revolutionary Guard offices or in jails [and] it is unclear whether this questioning constitutes a trial by a Revolutionary court or whether it is part of the investigation process. Sometimes defendants are released after several hours or days, but the process may be repeated two or three times before the authorities decide

the detainee is innocent or that he is guilty and should be jailed.

*Shirazi–Parsa v. INS,* 14 F.3d 1424, 1429 (9th Cir.1994) (alterations retained but emphasis removed from original text) *overruled on other grounds by Fisher v. INS,* 79 F.3d 955 (9th Cir.1996) (en banc).

To demonstrate the reality of his fear generated by the Pastar soldier at the time of the extortion and to explain the foundation of his fear of the future should he be forced to return to Iran, Petitioner submitted to the BIA contemporary chilling accounts of the Revolutionary Guard's barbaric capacity for torture and mayhem. The following is an excerpt from our Department of Defense's Emergency Net News Service Daily Report of 3 August 1996:

> The USA Today reported on Friday that classified U.S. intelligence documents indicate that the rogue state of Iran has a network of eleven camps to train terrorists. It is believed, according to the documents, that the bombers who conducted the attacks on the U.S. military sites in Saudi Arabia in November of 1995 and on 25 June 1996 were trained at these Iranian terror camps.

> The largest of the eleven sites is the Imam Ali camp, which is located east of Tehran. Other large camps are located northeast of Tehran in Qazvim; Qom, located south of Tehran; and another is located southwest of Tehran in Hamadan. All of the camps are said to be designed to look like small villages, with houses, shops and mosques. However, these small villages [are] all closed to the general public.

> The camps were discovered through satellite [observation], intelligence gathered by the National Security Agency and through HUMINT sources.

> Two organizations known as the Organization of Islamic Revolution and the Hezbollah of Hejaz are said to have received bomb training at the Imam Ali camp. U.S. intelligence believes that most of Iran's terrorist attacks are planned from Imam Ali.

> The classified documents allegedly indicated that the camps teach students how to assemble bombs and carry out assassinations. Up to 5,000 men and women have been trained at the camps. It is believed that at least 500 people have been taught such skills as how to make suicide bombs. Trainees for the camps are said to have come from: Algeria, Egypt, Gaza, Iran, Jordan, Lebanon, Libya, Saudi Arabia, Sudan, Syria, and Turkey.

> According to the documents, Iranian president Hasemi Rafsanjani set up the camps two years ago. The instructors in the camps are from Iran's Revolutionary Guard and intelligence service.

The June 26, 1995 edition of TIME—which is also part of the administrative record—corroborates this information:

> How potent is Iran's variety of militant political Islam? To Bill Clinton and Warren Christopher, it is one of the most dangerous forces on earth. But listen to what an Iranian housewife named Hafezeh has to say. Earlier this month, just before the sixth anniversary of the death of Ayatullah Khomeini, she sat on a carpet inside his gold-domed mausoleum. Under her loosely draped chador she wore blue jeans and a bright turquoise blouse.

> "I was just 16 when I joined the Revolutionary Guards [in 1979]," she said. "I used to go out in the patrol car with the sisters [female Revolutionary Guards]. They were looking for women who weren't wearing proper Islamic covering. They threw acid in their faces or said, 'Let me take off your lipstick,' and cut their lips with a razor hidden in a Kleenex." She also recalls the early lure of

plunder. "The government offered my husband and me a villa in north Tehran. It was incredible, like a palace. My husband said, 'No, we can't take it.' But there were many other Revolutionary Guards who drank alcohol and took people's houses. It sickened us, and we both quit."

After receiving continuing threats from the Pastar soldier, Petitioner and his family left Iran. Small wonder.

## B.

The IJ denied Petitioner's application for asylum and withholding of removal. The IJ concluded as to Jahed's claim of past persecution that although he had been a credible witness, he had established only that he had been the victim of an attempted extortion, not political persecution. The IJ noted that the soldier appeared to be motivated by his "isolated desire for money," and not by the applicant's political opinion. The IJ determined also from Jahed's testimony that the soldier was not acting in a government capacity. Finally, the judge found that Jahed's failure to buy off his extortionist "was not motivated by his political opinion or lack thereof, but rather by his inability to pay." The IJ indicated also that Jahed's extended family who remained in Iran had never been threatened or harmed, suggesting that his fear was not objectively reasonable.

As to Jahed's claim of a well-founded fear of future persecution should he be forcibly repatriated, the IJ concluded that because Jahed had not established past persecution, he was not entitled to a regulatory presumption of a well-founded fear of future persecution; and that because the facts adduced did not independently and objectively support this claim, it must fail. The IJ then denied his application for asylum and withholding of removal.

Dissatisfied not only with this result but also with the quality of his legal represen-

tation, Petitioner hired new counsel who filed a motion to reopen/reconsider before the IJ, claiming that (1) Petitioner's previous counsel provided ineffective assistance, and (2) the interpreter provided incompetent translation. While this motion was pending, Petitioner appealed the IJ's decision to the BIA. The IJ determined that the motion should be considered by the BIA. Petitioner filed with the BIA a request to consider the motion to reopen/reconsider as a motion to remand. Petitioner later filed a supplemental motion to remand, requesting relief under the United Nations Convention Against Torture ("Convention"). On February 22, 2002, the BIA adopted the IJ's decision, dismissed Petitioner's appeal, and denied Petitioner's motion to remand. The BIA's decision did not address Petitioner's request for relief under the Convention.

## C.

On March 20, 2002, Petitioner filed a petition for review with this Court. On April 1, 2002, Petitioner submitted a motion requesting that the BIA reconsider its decision because it failed to address his claim under the Convention. The BIA denied the motion as untimely, but in a footnote explained that Petitioner had failed to present a prima facie case for protection under the Convention. Petitioner did not petition this Court for review of the BIA's denial of this motion to reconsider.

## STANDARD OF REVIEW

 We review the BIA's factual determinations under a "substantial evidence" standard. *Singh–Kaur v. INS,* 183 F.3d 1147, 1149 (9th Cir.1999). The BIA's asylum eligibility determination cannot be overruled on a petition for review pursuant to 8 U.S.C. § 1252(a) if "supported by reasonable, substantial, and probative evi-

dence on the record considered as a whole." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Moreover, we "must uphold the BIA's findings unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result." *Singh–Kaur* at 1149–50. In the words of the Supreme Court, an asylum applicant who "seeks to obtain judicial reversal of the BIA's determination [ ] must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. 812. Where, as here, "the BIA adopts an IJ's findings and reasoning, we review the IJ's opinion as if it were the opinion of the BIA." *Id.* at 1150.

■ "We review de novo the BIA's determination of purely legal questions, including the BIA's interpretation of the Immigration and Nationality Act." *Socop-Gonzalez v. INS,* 272 F.3d 1176, 1187 (9th Cir.2001) (en banc) (citation and internal quotation marks omitted). "Deference to the INS's interpretation of the immigration laws is only appropriate if Congress' intent is unclear." *Id.* (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "We are not obligated ... to accept an interpretation that is contrary to the plain and sensible meaning of the statute." *Chowdhury v. INS,* 249 F.3d 970, 972 (9th Cir.2001).

## DISCUSSION

### A.

■ Under 8 U.S.C. § 1158(b)(1), the Attorney General has discretion to grant asylum to an alien determined to be a "refugee." A refugee is defined as any person who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Petitioner here had the burden of establishing his eligibility for asylum as a "refugee" by showing that he was persecuted or has a "well-founded fear of [future] persecution on account of ... political opinion." *Chebchoub v. INS,* 257 F.3d 1038, 1042 (9th Cir.2001).

Petitioner provided uncontroverted evidence both in his application and his testimony—found by the IJ to be credible, generally consistent, and corroborated by "considerable" documentary evidence—that an agent of the Iranian government repeatedly threatened him with harm because of his political affiliation and opinion, which he made evident by openly associating with the Mojahedin between 1981–1985. A soldier in the Iranian Revolutionary Guard, a functional arm of the Iranian government, recognized Petitioner as an individual associated with the rival Mojahedin and threatened Petitioner with exposure and consequent injury at the hands of the government if he did not pay the soldier a sum of money. According to the IJ, the "soldier told the applicant that if the government discovers that he was a member of the Mojahedin, the applicant would be in trouble, he would lose his job and go to jail for the rest of his life." In return for a buy off, the soldier promised to withhold his knowledge of Petitioner's association from the Iranian government. In a series of contacts and meetings the soldier pressured Petitioner to pay under a continuing threat to turn him in to the government. We quote from the IJ's order of May 27, 1999:

> Approximately 10 days after the meeting in the park, the soldier telephoned the applicant again. The applicant told him that he had 20,000 toomans, but that he would have to sell his apartments to get the remainder of the money. Two days later, the soldier came to the appli-

cant's home to retrieve the 20,000 [t]oomans. He told the applicant that he had better hurry to get the remaining money. The applicant showed the soldier the apartment that he would have to sell to get the rest of the money. The applicant stated that if the soldier had reported him to the government, the soldier would receive a new car imported from England as a reward. The applicant testified that he believed that even if he paid the full amount of money to the soldier, the soldier would still report him to the government.

Petitioner, who could pay only part of the sum demanded, fled his country to avoid the dire consequences of failure to submit to intimidation.

Petitioner testified also that in 1998 Iranian newspapers reported the execution of an elderly couple who, like Petitioner, had been involved with the Mojahedin in the 1980's. He reported in his request for asylum, which is part of the "record as a whole" which the law requires us to consider, that a similar incident had occurred to a named friend, Cyrus Yaghley, and that the friend had been blackmailed by the Pastars only to be imprisoned and never heard from again.

### B.

■■■ The BIA concluded with respect to both grounds specified in the asylum statute that although credible, Petitioner had not demonstrated (1) that he had been persecuted, and (2) that he did have a well-founded fear of future persecution. The key to the IJ's analysis upon which the BIA relied was the IJ's undiscerning view that although the Petitioner "did experience criminal extortion," the Pastar soldier who committed the extortion was on a frolic of his own, one motivated by purely personal and economic interests, not politics. We respectfully disagree.[2] We conclude from this record and from the facts found to be true by the IJ that Petitioner's evidence would compel any reasonable factfinder to reach a contrary result on *both* grounds specified in the statute. The undeniable political context of this extortion, which was inextricably coupled with the threat of political exposure to the hostile Iranian government, cannot be ignored or discounted on the ground that the extortionist representative of the government suggested as an alternative that he might pocket the money. As far as the soldier's conduct goes, "[p]ersecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied." *Borja v. INS,* 175 F.3d 732, 735 (9th Cir.1999) (en banc) (quoting *Singh v. Ilchert,* 63 F.3d 1501, 1509–10 (9th Cir.1995)); *see also Briones v. INS,* 175 F.3d 727, 729 (9th Cir.1999) (en banc). Our opinion in *Borja* relied on part of the United Nation's *Handbook on Procedures and Criteria for Determining Refugee Status* which says, "[W]hat appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves." *Id.* at 735 (quoting *Osorio v. INS,* 18 F.3d 1017, 1029 (2d Cir.1994) (quoting U.N. Handbook at §§ 62–64)).

Moreover, the consequence of the soldier's threats and demands which petitioner fears is not simply the ire of a vindictive unpaid extortionist, but what will be done

---

**2.** The IJ cannot be held entirely responsible for her failure to perceive the clear context and dimensions of the soldier's threat and Jahed's fear. The legal representation he received, which has been made the subject of a disciplinary complaint, was, to put it mildly, pathetic.

to him by the Iranian Government if he is turned in as a political opponent. The government will not beat, torture, execute, or arbitrarily imprison Jahed because he did not pay the soldier, but because of his active political opposition to a nasty regime. This real prospect is (1) what renders the soldier's actions persecution in fact, and (2) generates Jahed's well-founded fear of persecution in the future. The extortionist did not threaten personally to inflict bodily harm on Jahed, he threatened instead to unleash the fury of an uncivilized government against him if he did not succumb. The soldier may have cocked his own gun, but the bullet in the firing chamber was the government's.

Furthermore, the IJ found that Jahed could not pay the full price for his safety; but even if he could have, would we expect him to have done so? Such hallucinatory thinking misapprehends both extortionists and extortion. Once enriched by their crime, extortionists rarely go away, and their continued success depends upon being able to force a victim to live in fear. The official policy of the United States not to negotiate with terrorists is a good one. The policy recognizes the reality of persons who use fear to attain their goals. Petitioner's fear of being turned in even if he paid was understandable.

Petitioner's evidence viewed in its totality clearly establishes a causal connection between the persecution, the fear of future persecution, and Petitioner's political opinion. *See Sangha v. INS,* 103 F.3d 1482, 1486–87 (9th Cir.1997). Persecution may be "on account of" a political opinion when a persecutor says he is acting because of a victim's political beliefs. *Id.* at 1490. Thus, even though Petitioner may no longer have been associated with the Mojahedin, the soldier singled out Petitioner because he had been previously associated with that political group. We note here that the 1997 Country Report says that both known and "suspected" members face harm if caught in Iran. On these facts, the soldier was acting because of political beliefs based on an association he ascribed to Petitioner, *see id.* at 1489, and it is because of these beliefs that Petitioner may face a terrible fate if returned to Iran.

This case is close in its relevant facts to *Gonzales–Neyra v. INS,* 122 F.3d 1293 (9th Cir.1997) *as amended by* 133 F.3d 726 (1998) wherein the petitioner became the target of extortion demands by Shining Path guerillas. The guerillas threatened the petitioner with the closure of his business if he did not pay them money. When he resisted and told the guerillas he would not pay because he did not support their cause, they threatened him with death and the destruction of his business. Because the extortion was tied to the petitioner's political opinion, we overruled the BIA and granted his petition on the ground that the evidence compelled the conclusion that the threats to his life and business were causally connected to his political beliefs. Here, the government soldier certainly intended to extort money from Petitioner for his own gain, but his motive in doing so was inextricably intertwined with the Petitioner's past political affiliation. The soldier's threat was that the government would be the instrumentality of the Petitioner's unwelcome fate, as it apparently had been for his friend, Cyrus Yaghley.

By comparison, this case is patently distinguishable from *Bolshakov v. INS,* 133 F.3d 1279 (9th Cir.1998), upon which the government and the dissent rely. The difference is that the thugs committing extortion and robbery against Bolshakov never mentioned anything about his political affiliation or membership in a political group. Clearly, they were just criminals with no interest in politics or political opinion, only money; and the scenario feared by Bolshakov was another attack by the

thugs, not violence by a politically hostile government.

The IJ and BIA failed to recognize that the soldier who committed extortion was part of the totalitarian government to which the Petitioner had been opposed when he was active in the Mojahedin. The soldier was not a civilian simply taking advantage of a fellow civilian's vulnerability, but a corrupt member of the government's revolutionary guard charged with internal security whose government the Petitioner opposed. Moreover, the IJ utterly failed to realize that although the soldier himself did not personally threaten harm, he represented that it would be done by the government by which he was employed, and that the government would do so because of Petitioner's political opposition. This record compels the conclusion that Jahed's fear of the government created by the unscrupulous soldier was objectively reasonable.

This scenario reminds us of the Supreme Court's holding in *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) that state officers were acting under "color of state law" even though what they were doing in beating their victims might have actually violated the law they were sworn to enforce. Likewise, the soldier here was functionally a government agent even though he may have intended to pocket the money himself. Moreover, the Petitioner testified that he anticipated being turned in by the soldier even if he paid, making it far more likely than not that he will be set upon by the government. These circumstances compel the factual conclusion that the extortion found by the IJ to have occurred was "on account of" Petitioner's political opinion.

### C.

The facts found to be true by the IJ establish not only that Petitioner was persecuted on account of his political opinion, but also that he has a well-founded fear of future persecution should he be returned to Iran, a fear that is "both subjectively genuine and objectively reasonable."[3] *Fisher,* 79 F.3d at 960. His case on this ground is unassailable. He could not and did not pay the soldier. Can we cavalierly say that his failure and his understandable flight dispel the threat? Hardly. Furthermore, in the context of a fear of *future* persecution, it would seem that even if the extortionist were no more than a private citizen or a thug, that would be irrelevant. Whatever the source of Petitioner's exposure, the feared result at the hands of the government would be the same. We turn for guidance to the 1997 Country Report:

> Credible reports indicate that security forces continue to torture detainees and prisoners. Common methods include suspension for long periods in contorted positions, burning with cigarettes, and, most frequently, severe and repeated beatings with cables or other instruments on the back and on the soles of the feet. A July 1996 law strengthens Islamic punishments such as flogging, stoning, amputations, and public executions. Four people were reported to have been stoned in 1997. According to Amnesty International, in August a 20–year–old woman, Zoleykhah Kadkhoda, was arrested on charges of adultery and stoned on the same day, but survived. Prison conditions are harsh. Some prisoners are held in solitary confinement or denied adequate food or medical care in

---

**3.** Establishing past persecution triggers a rebuttable presumption that the petitioner has a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(ii); *Lal v. INS,* 255 F.3d 998, 1002 (9th Cir.), *as amended by* 268 F.3d 1148 (9th Cir.2001). "An alien who establishes past persecution is entitled to a regulatory presumption that she has a well-founded fear of future persecution." *Korablina v. INS,* 158 F.3d 1038 (9th Cir.1998).

order to force confessions. Female prisoners have reportedly been raped or otherwise tortured while in detention. In the past, prison guards have intimidated the family members of detainees and have sometimes tortured detainees in their presence. Special Representative Copithorne met privately in 1996 with detainee Abbas Amir Entezam, a former deputy minister in the government of Prime Minister Mehdi Bazargan. Amir Entezam reported that the conditions in Evin prison improved after 1989, but that political prisoners still were housed with violent criminals and denied regular family visits. Amir Entezam claimed that he was beaten so severely that he lost the hearing in his left ear. There is no indication that conditions in the prisons have improved substantially since Copithorne's visit.

## CONCLUSION

■ We conclude that Petitioner established that he fits within the statutory definition of "refugee" because of his past persecution as well as his present well-founded fear of future persecution, and is therefore eligible with his immediate family for asylum because of his political opinion. The record leaves no doubt that he was singled out for avengement on account of his politics. As to his future, the evidence here is "so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812. To hold otherwise would be to act as a rubber stamp or a decorative potted plant in disregard of Congress' expectation that we correct the BIA's factual decisions where that body has made an egregious mistake. *Borja,* 175 F.3d at 739 ("In conferring upon us the responsibility to re-

view these petitions, we believe that Congress expects no less."). The fact that his relatives who remained behind have not been set upon is manifestly irrelevant! We regret our dissenting colleague's ire, but we simply do not view his analysis of these facts as either sound or reasonable.

■ We note that according to the IJ there is no evidence in the record "which reflects adversely on the applicant's character." Accordingly, we remand for the Attorney General to make a discretionary decision regarding whether to grant asylum to Petitioners. *See* 8 U.S.C. § 1158(b); *Gonzales–Neyra,* 122 F.3d at 1296.[4] We do so with the understanding that the BIA is free pursuant to 8 C.F.R. § 208.13 to consider relevant factors such as a "fundamental change in circumstances," *id.,* § 208.13(b)(1)(i)(A), reasonable relocation, *id.,* § 208.13(b)(1)(i)(B), § 208.13(b)(2)(ii), etc. *See also INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 355, 154 L.Ed.2d 272 (2002) (where the BIA has not made findings on an issue of fact, "the proper course … is to remand to the agency for additional investigation or explanation.") (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). Given the substance of our decision, we remand also Petitioners' request for withholding of deportation to the BIA for further consideration.

PETITION GRANTED.

KOZINSKI, Circuit Judge, dissenting:

The question in this case is, in the immortal words of Humpty Dumpty, which is to be the master—that's all. When it comes to the granting of asylum, Congress has said the BIA is the master. The

---

4. Petitioners claim also that the BIA should have granted their motion to remand because their right to due process was denied by their counsel's ineffective assistance and the inter-

preter's inadequate translation. We need not reach these issues in light of our conclusion on the merits.

statute provides it, the other courts of appeals recognize it and the Supreme Court keeps reminding us of it. But to no avail. Maybe there's something in the water out here, but our court seems bent on denying the BIA the deference a reviewing court owes an administrative agency. Instead, my colleagues prefer to tinker—to do the job of the Immigration Judge and the BIA, rather than their own. *See, e.g., INS v. Chen,* 537 U.S. 1016, 123 S.Ct. 549, 154 L.Ed.2d 423 (2002); *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002); *INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

This is yet another case in point. After carefully considering the record and correctly identifying the applicable law, the IJ concluded that petitioner is not eligible for asylum; the BIA affirmed, based largely on the IJ's written opinion. The agency did not misunderstand the law or overlook key evidence; the agency did everything just right. What my colleagues find fault with, rather, is the process at the very heart of the agency's authority and expertise: determining the basic facts undergirding an applicant's asylum claim.

The IJ and the BIA made two findings that fatally undermine petitioner's asylum claim: first, that whatever harassment petitioner may have suffered in his native country was not on account of his political opinion; and, second, that the harassment was not by the government. Not so fast, say my colleagues. We know such things much better than the IJ and the BIA, so we're going to find the facts ourselves. But, isn't this what we got slammed for just last Term? Well, never mind. The government can't bother the Supremes every time we go over the top, so it's a fair bet that if we keep marching to our own drummer we'll mostly get away with it. Being the circuit with more asylum cases than all others combined, *see INS v. Chen,* Pet. for Cert. 2002 WL 32101070 at *29, *available at* http://www.usdoj.gov/osg/ briefs/2002/2pet/7pet/2002–0025.pet.aa.pdf, gives us molto institutional leverage.

But it's not right. We have our job to do, and the BIA and the IJs have theirs. The process cannot work as Congress intended if we keep usurping the agency's job rather than doing our own. This is a simple case with simple issues, most controlled by precedent; due deference to the agency's functions calls for a straightforward affirmance of the agency's reasonable decision.

1. Petitioner claims that, for a brief period in his youth, he was affiliated with a group called the Mojahedeen. The IJ found that petitioner "was not an official member. Rather, he belonged to a group that supported the Mojahedeen, distributed literature for them, sold newspapers and attended meetings." A.R. at 160.[1] He quit in 1982, got a university degree and worked for a number of years for the Iranian government. Then, in 1990, he was approached by a soldier in the Iranian Revolutionary Guard, an outfit also known as the Pastars. This soldier recognized him as a former Mojahedeen affiliate and attempted to blackmail him with this information. The soldier threatened that, if petitioner did not pay a large sum of money, the soldier would report him to the government and petitioner would be arrested. The question presented is

---

1. This is entirely consistent with petitioner's testimony:

 Mojahedin, it's a big group in Iran and I was not officially member of the group. It has a two separate group. One group it was a main member of the group, they were working for the group and the other member it was like a people are working for those people. And I was the second group. I wasn't even a member.

 A.R. at 231.

whether this encounter must be considered persecution for purposes of our asylum statute.

Reprehensible though the soldier's conduct was, it does not amount to persecution under the asylum statute unless it satisfies two statutory criteria: it must have been "on account of ... political opinion,"[2] 8 U.S.C. § 1101(a)(42)(A), and it must have been done on behalf of the government, *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997).[3]

The IJ carefully considered the evidence and ruled against petitioner on both grounds. She found the soldier did not blackmail petitioner on account of his political opinion, but was "motivated by his isolated desire for money." A.R. at 165. The IJ also found the soldier was not "acting in concert with the government," but was engaged in a private act of extortion—an attempt to get petitioner to pay money that the soldier would use entirely for his private purposes. *Id.* at 166. Any court applying the proper standard of review and giving the administrative agency the deference to which it is entitled would readily accept both of these findings.

a. Whether persecution is "on account of" a petitioner's political opinion is a question of fact; it turns on evidence about the persecutor's motives. Here, the IJ found that "[t]he actions of the soldier appeared motivated by his isolated desire for money, not by the applicant's political opinion. Furthermore, the applicant's failure or refusal to pay the bribes was not politically motivated." *Id.* at 165. The record amply supports the IJ's findings. Petitioner's

own testimony—which is the only evidence we have on this point—makes it plain that the soldier was "not interested" in whether petitioner was still "politically involved," *id.* at 161; his only concern was with petitioner's ability to pay.

Our cases have long held that private acts of extortion cannot form the predicate for an asylum claim. In *Bolshakov v. INS*, 133 F.3d 1279 (9th Cir.1998), we held that applicants seeking to prove past persecution must show more than merely "that they had been the victim of criminal activity." *Id.* at 1281. Similarly, in *Florez-de Solis v. INS*, 796 F.2d 330 (9th Cir.1986), we held that a group that collected a private debt violently was not acting on account of political opinion despite its political affiliation. *Id.* at 355; *see also Sangha*, 103 F.3d at 1491 (holding that recruitment of petitioner by a guerilla group may have had non-political justifications).

The majority disregards these cases and purports to follow *Gonzales–Neyra v. INS*, 122 F.3d 1293 (9th Cir.1997). But this case cuts entirely the wrong way. Gonzales–Neyra was subjected to extortion by guerrillas trying to raise funds to support their cause. After paying for a time, he stopped because he objected to their political agenda, at which point the guerrillas stepped up their harassment. We held that the guerrillas' action was politically motivated because it was taken in retaliation for petitioner's political disagreement: Petitioner's "life and business [were] threatened *only after* he expressed his political disagreement with the guerilla organization, and *only after* he made clear

**2.** The statute provides other grounds that might be the basis of persecution, such as religion or ethnicity, but petitioner has not claimed relief based on any of these. 8 U.S.C. § 1101(a)(42)(A).

**3.** Petitioner may also meet the statutory criteria by showing persecution by a non-governmental entity the government is "unable or unwilling" to control. *See Singh v. INS*, 134 F.3d 962, 967 n. 9 (9th Cir.1998). Petitioner has not claimed eligibility on the ground that the government was "unable or unwilling" to control the soldier, nor can he, as there is no indication the Iranian government was even aware of the soldier's activities.

that his refusal to make further payments was on account of that disagreement." *Id.* at 1294 (emphases added). We explained that "[t]he persecution of which Gonzales–Neyra complains is *not the extortion,* but the threats upon his life and business that were made *after the guerillas learned of his political orientation." Id.* at 1296 (emphases added).

By contrast, the IJ here found that petitioner's "reason for not paying the soldier was not motivated by his political opinion or lack thereof, but rather by his inability to pay. The soldier did not appear motivated by political interests, but rather by purely personal and economic interests." A.R. at 165. The IJ continued: "The soldier did not appear to interpret the applicant's inability to pay as politically motivated, or as an indication that he still was politically involved with the Mojahedeen." *Id.* The IJ then found that "[t]he actions of the soldier were not directed toward modifying or punishing the applicant's previous political opinion." *Id.* at 166. Finally, the IJ concluded that "the soldier's actions were extortion related, motivated not by [petitioner's] political opinion, but rather motivated by his ability to pay." *Id.* The IJ's findings could not have been clearer.

The majority nevertheless reverses on the curious ground that the soldier's motive in blackmailing petitioner was "inextricably intertwined with the Petitioner's past political affiliation." Maj. op. at 1000. It is true, as the majority asserts, that there may be more than one motive for persecution. The IJ recognized this when she noted that "[i]n some cases, possible mixed motives for inflicting harm exist." A.R. at 163. Nevertheless, the IJ found that the soldier here did not act from mixed motives, but only to enrich himself: The soldier was "motivated by ... *purely personal and economic interests." Id.* at 165 (emphasis added). The majority holds that the IJ was required to find a mixed

motive, even though she was convinced that the persecutor's motive was not mixed. The majority thus substitutes a new rule of law for a finding of fact, precisely the kind of maneuver the Supreme Court disapproved in *Ventura,* 123 S.Ct. at 356.

It is, moreover, a rule of law with sweeping implications. Political belief is only one ground for asylum; there are a number of others, such as religion and ethnicity. *See* n. 2 *supra.* If blackmailing someone on grounds of political opinion or imputed political opinion is a basis for asylum, the same would have to be true of blackmail on any of the other grounds specified by the asylum statute. Thus, if someone in a Muslim country is blackmailed for having failed to wear proper face covering or for drinking alcohol, the blackmail automatically becomes persecution "on account of" religion for purposes of asylum, even if the blackmailer is interested only in money. This vastly and unjustifiably expands the grounds for asylum beyond those contemplated by Congress.

**b.** Equally unfounded is the majority's conclusion that the blackmailer acted on behalf of his government. The record amply supports the IJ's contrary finding that the blackmailer was acting for "his own personal monetary gain" and "not in a government capacity." A.R. at 166. The record contains no evidence that the Iranian government was aware of the soldier's activities, much less encouraged him. Indeed, the fulcrum of the extortion threat was that the soldier would *not* report petitioner to the government. Moreover, the IJ found that petitioner and his family "were permitted free departure from Iran," and petitioner "was not required to obtain an exit permit," even though "the Iranian government requires exit permits for citizens it considers politically suspect." *Id.* at 165. On this record, the trier of fact was entitled to find that the persecutor,

though on the government payroll, was on a frolic of his own.

The majority once again disregards the IJ's perfectly reasonable finding that petitioner "does not appear to have been acting in concert with the government," *id.* at 166, by displacing it with a rule of law—a rule plucked from a wholly different context, no less. Maj. op. at 1000 (citing *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). Putting aside whether it makes any sense to apply caselaw dealing with the conduct of American police officers to an Iranian soldier's relationship to his government, the majority patently misapplies *Screws.* The very point of *Screws* was that the defendants there were acting as law enforcement officers carrying out official duties. *Screws,* 325 U.S. at 111, 65 S.Ct. 1031. Because "[i]t was their duty under Georgia law to make the arrest effective," their conduct, though unauthorized by state law, still "comes within the statute." *Id.* at 107–08, 65 S.Ct. 1031. But the Court limited its analysis to the "official" conduct of government agents—conduct calculated to achieve law enforcement purposes. *Id.* at 111, 65 S.Ct. 1031. The Court made a point of saying that "acts of officers in the ambit of their personal pursuits are plainly excluded." *Id.*

Here we have a finding that the blackmailer was acting out of his own private interests, not as a representative of his government, nor to advance some governmental purpose. The record amply supports that finding; indeed, there is no contrary evidence. The majority's conclusion thus cannot be based on the particular facts and circumstances of this case, because none support the majority's view. Instead, the majority adopts a new rule of law that the actions of agents and employees of foreign governments are always attributable to that government, even if the employees are acting entirely without official sanction and are pursuing only personal objectives.

This is a rule with explosive potential. Governments all over the world have a multitude of agents and employees, especially if one includes every rank-and-file member of the armed forces—like the soldier who blackmailed petitioner. Moreover, corruption by government officials—use of their official position to line their pockets—is a way of life in many countries. According to today's decision, all such conduct is automatically attributable to the government employing the corrupt official—at least if the issue is presented in the Ninth Circuit. I doubt this is what Congress had in mind when it gave the courts of appeals authority to review asylum petitions.

2. The majority also seems to hold that petitioner is eligible for asylum based on the alternative prong of the test, namely that petitioner established a well-founded fear of future persecution, whether or not he showed past persecution.[4] Once again, the IJ made specific findings the majority entirely ignores. The IJ found that "no accounts of extortion, threats or persecution against former Mojahedeen members have been reported." A.R. at 167. Though petitioner claimed that stories of government persecution had been reported in Iranian newspapers published in the United States, the IJ did not credit this argument because petitioner "failed to provide

---

4. Admittedly, the majority opinion is somewhat confused on this point. The footnote pertaining to past persecution is, for reasons that are unclear, placed within the paragraph discussing future persecution. *See* Maj. op. at 1000 n. 3. But, the majority holds that petitioner has established eligibility for asylum "on *both* grounds specified in the statute," *id.* at 998, and there would be no point in discussing future persecution if the majority were only relying on the presumption arising from past persecution.

the Court with even one of these newspaper articles." *Id.* Furthermore, the IJ found that, although the soldier knew where petitioner's parents and sisters lived, they had "continued to reside in Iran without any contact from, or harassment by, this soldier or any government official for nearly the past 9 years." *Id.* Based on these facts, the IJ found that petitioner had no legitimate reason to fear government persecution upon his return to Iran.

The majority disregards these findings and, instead, takes refuge in a long and irrelevant passage from the 1997 Iran Country Report. Maj. op. at 1000. The passage shows that conditions in Iran, especially in prison, were pretty bad at the time, but it says nothing of consequence concerning petitioner's situation. Nor is the majority's position supported by the Country Report passage it quotes earlier in its opinion, discussing actions taken against certain members of the Mojahedeen. *Id.* at 994. The report explains that the Iranian government has targeted *leaders* and *prominent members* of the Mojahedeen because of that group's terrorist activities, which "includ[ed] assassinations and car bombings" and, during the Iran–Iraq War, "full-scale military operations against the Islamic regime." A.R. at 125. That Iran targeted leaders of an organization actively involved in terrorism is hardly surprising; our government does much the same. This does not mean that Iran is persecuting all those ever affiliated with the group, no matter how long ago or

how peripheral their involvement. Petitioner was not even a member of the Mojahedeen and his activities were limited to distributing literature. *See* page 1002 & n. 1 *supra.* There is nothing in the record to support the finding that people in petitioner's position were being persecuted.

Grasping at straws, the majority refers to petitioner's friend Cyrus Yaghley, who supposedly was blackmailed and eventually disappeared. Maj. op. at 999; *see also id.* at 998. But Yaghley's name never appears in petitioner's testimony; here is all petitioner says that is even remotely relevant:

Q. Now, do you *know of* any people that it happened to them.

A. Yes, *sort of.*

Q. What happened?

A. I just; they keep bothering them and then some of them, they are in jail.

. . . .

Q. Do you know of other people who refused to pay and ended up in prison?

A. Yeah, yeah.

A.R. at 210–11 (emphases added). Petitioner says nothing about who these individuals were, whether they were involved with the Mojahedeen and how they came to be in jail, though he does admit that he only "sort of" knew "of" them—hardly how one would refer to a friend. It's conceivable that this testimony refers to Yaghley but, if so, its very vagueness makes it useless to petitioner, and the IJ was fully justified in discounting its significance.[5]

---

5. Yaghley's name does appear in petitioner's asylum application. A.R. at 249. But the IJ's credibility finding covers only petitioner's live testimony, not assertions in his application. In any event, the application hardly helps petitioner. He states there as follows: "A similar incident had occured [sic] to a friend, Cyrus Yaghley of Tehran; he was similarly blackmailed by the Pastars, didn't pay, and was imprisoned with his entire family in Tehran in 1987 and has not been heard of since." *Id.* Petitioner says nothing about whether

Yaghley was ever involved with the Mojahedeen and, if so, whether his level of involvement was similar to petitioner's. Nor does petitioner explain how he knows the circumstances surrounding Yaghley's disappearance. If petitioner "sort of" knew Yaghley or knew only "of" him, *id.* at 210–11, his information on these important points would be based entirely on hearsay and rumor. Petitioner could have filled out these details when he testified, but he did not; his testimony is vaguer even than his application. Petitioner

The simple fact is that the majority provides no justification at all for reversing the IJ's and the BIA's finding that petitioner lacks a well-founded fear that he would be persecuted were he to return to Iran. The majority's perfunctory analysis not only does not *compel* reversal, it doesn't even support it. *See INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). All it does is to further "whittle away the authority and discretion of immigration judges and the BIA." *Abovian v. INS,* 257 F.3d 971, 971 (9th Cir.2001) (Kozinski, J., dissenting from denial of rehearing en banc).

3. Which brings us back to who is the master in asylum cases. The Supreme Court's summary reversal in two immigration cases last Term must be understood as a wake-up call that our jurisprudence in this area of the law is in need of repair. *See Ventura,* 123 S.Ct. at 355–56; *Chen,* 123 S.Ct. at 549. The Supreme Court does not normally take up routine cases involving simple errors in settled areas of the law. But the Supreme Court did so in these cases upon the urging of the Solicitor General, who pointed out the "increasing[ ] importan[ce]" of asylum cases "to enforcement of the immigration laws." *Chen,* Pet. for Cert. at *28. Moreover, as the Solicitor General noted, "[a]sylum decisions ... are 'vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power,' and the definition of the national community." *Id.* (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952)).

The Supreme Court pointedly quoted the Solicitor General's complaint that, in an area where a uniform national policy is crucial, the Ninth Circuit is often "in conflict with other courts of appeals, which generally respect the BIA's role as factfinder." *Ventura,* 123 S.Ct. at 355 (citing *INS v. Ventura,* Pet. for Cert. at 11, *available at* http://www.usdoj.gov/osg/briefs/2002/2pet/7pet/2002–0029.pet.aa.pdf, and *Chen,* Pet. for Cert. at **22–24) (internal quotation marks omitted). The Solicitor General's petitions in *Ventura* and *Chen* actually said quite a bit more. For example, we were accused of "develop[ing] a body of circuit law that relieves the applicant of his burden of proof in asylum cases and allows the court to substitute its own views about contested record evidence for reasonable determinations of the BIA." *Chen,* Pet. for Cert. at *14. Our precedents were also characterized as "absurd[ ]," *id.* at *18, and as "def[ying] the most basic rules of judicial review," *id.* at *13. The Supreme Court tactfully spared us the embarrassment of quoting these passages, but how much longer can we count on such forbearance?

Having identified our proclivity for error, the Court proceeded to administer a mini-tutorial as to the applicable blackletter principles of administrative law. *Ventura,* 123 S.Ct. at 355–56. While the Court was careful to limit its ruling to the facts presented, its message to us was clear to anyone with eyes to see: Stop substituting your judgment for that of the BIA; give proper deference to administrative factfinding; and do not adopt rules of law that take away the agency's ability to do its job. In other words, stop fiddling with the agency's decisions just because you don't like the result.

We could, of course, read the Supreme Court's decisions in *Ventura* and *Chen* as limited to the questions presented in those

bears the burden of establishing his entitlement to asylum; his failure to provide any details supporting his claim that individuals involved in the distant past with the Mojahe- deen have been targeted for persecution provides ample basis for the IJ's decision to reject his testimony on this point. *Id.* at 167.

cases. But this would be a big mistake. The Court gave us fair warning that our jurisprudence in this area of the law falls well outside the mainstream. The Court also gave us a gentle hint that we must revise our mindset on the key question about who's the master when it comes to immigration cases. We must come to understand and accept—as the other courts of appeals have—that "[w]ithin broad limits the law entrusts the agency to make the basic asylum eligibility decision." *Id.* at 355. The majority's reversal of the BIA's and IJ's perfectly reasonable, thoroughly considered decisions in this case shows that my colleagues have not yet taken this lesson to heart.