Mang KHUP, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02–74059.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 2004.

Filed July 16, 2004.

Thomas J. Mills, Esq., United Methodist Committee on Relief—Justice for Our Neighbors, New York, NY, for the petitioner.

Rena I. Curtis, Civil Division, U.S. Department of Justice, Washington, DC, for the respondent.

Before THOMPSON, TASHIMA, and RAWLINSON, Circuit Judges.

TASHIMA, Circuit Judge.

Mang Hau Khup, a native and citizen of Burma (now known as Myanmar), has petitioned for review of a decision of the Board of Immigration Appeals ("BIA") denying his applications for asylum, withholding of removal, and protection under Article 3 of the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") found Khup to be a credible witness, but denied relief on the grounds that he had not suffered past persecution and did not have a well-founded fear of future persecution. Khup contends that the record compels a finding that he suffered past persecution and that he more likely than not will be tortured if he is returned to Burma. We agree, and grant his petition for review.

## BACKGROUND

Khup alleges that he was persecuted by the Burmese military on account of his religious activities and an imputed political opinion. As the IJ found Khup to be a credible witness, the following facts are drawn from Khup's testimony at his hearing before the IJ and from Khup's asylum declaration.

Khup is a Seventh Day Adventist ("Adventist") who until 1995 lived in Chin State in Burma. Although a majority of the population of Chin State is Christian, the majority religion of Burma is Buddhism and the highly repressive military government oppresses Christians. Khup trained to be an Adventist minister and was assigned to a ministry in Lezang village.

Khup's first run-in with the Burmese military occurred in November 1990, while he was worshiping at a church in Tungzang village. Soldiers stopped the service and forced Khup and the other worshipers at gunpoint to carry heavy military provisions for 20 miles over hilly terrain. The soldiers did not give Khup or the other porters any food during the forced march and treated them roughly. When they arrived at their destination that night, the soldiers released Khup and the others.

Khup later joined an Adventist evangelist minister named U Myint, who was trying to convert the Naga people in Kachin state to Christianity. The military warned U Myint and Khup not to promote Christianity, but they preached the gospel anyway. In June 1995, the military arrested U Myint in Mang Kring village. Villagers told Khup that the military had beaten and tortured U Myint throughout the night and had then killed him and dragged his body through the streets as a warning to others. The villagers told Khup that the military was looking for him too, so he fled and returned to Lezang village.

Upon Khup's return to Lezang village, he learned that the military was searching for him there also, so he went into hiding on a farm. He went from Lezang to Tungzang, but it was not safe there either. He then traveled to Rangoon (now known as Yangon) and used a passport broker to

buy a passport. He could not go to the passport office himself, because he was on the run and would have been arrested.

Once Khup obtained his passport, he fled through Thailand to Malaysia and stayed there for five years. He did not apply for asylum while in Malaysia, because the Malaysian government did not offer asylum and in fact sent illegal immigrants back to Burma. He did not go to the United States embassy or any other foreign embassy in Kuala Lumpur to see if he was eligible for asylum, because he did not know that it was possible to do so.

A friend of Khup named U Thawng Lang, who was an Adventist pastor and an associate of U Myint, also fled to Malaysia, but later decided to return to Burma. Khup received a letter from U Thawng Lang, who reported that upon his return to Burma he had been arrested by the military at the airport. In the letter, U Thawng Lang stated that the military had put him into a forced labor camp, had beaten and tortured him, and had fed him only one small bowl of rice a day. The military had also forced him to carry military supplies in the Karen rebel area, and he had been able to escape during fighting with the rebels.

After receiving this letter from U Thawng Lang, Khup knew he could not return to Burma when his Malaysian work permit expired. He believed that he would have been subject to heightened scrutiny at the airport because of his Chin ethnicity, and the government officials would soon have found out about his connection to U Myint. When Khup heard about the Guam visa waiver pilot program, he emigrated to Guam.

Khup entered Guam on January 9, 2001, and applied for asylum on March 6, 2001. The INS placed Khup in removal proceedings in June 2001 on the ground that he had overstayed the visa waiver pilot program. At Khup's merits hearing on his applications for relief from removal, the IJ found that Khup was a credible witness, but that he had not suffered past persecution and that he did not have a well-founded fear of future persecution. The BIA affirmed without opinion the IJ's decision pursuant to 8 C.F.R. § 3.1(e)(4) (2002).

## JURISDICTION

The BIA had jurisdiction over Khup's appeal of the IJ's decision pursuant to 8 C.F.R. § 3.1(b)(3) (2002). Khup's removal proceedings began after April 1, 1997, and we therefore have jurisdiction over his petition for review pursuant to 8 U.S.C. § 1252(a)(1). *See Gormley v. Ashcroft,* 364 F.3d 1172, 1176 (9th Cir.2004).

## STANDARD OF REVIEW

 Where the BIA affirms an IJ's order without opinion, we review the IJ's order as the final agency action. *Kebede v. Ashcroft,* 366 F.3d 808, 809 (9th Cir. 2004). Factual findings underlying the IJ's order are reviewed for substantial evidence. *See Gormley,* 364 F.3d at 1176. Under this standard, the IJ's eligibility determinations must be upheld if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quoting *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). To reverse the IJ's determinations, the evidence Khup presented at his hearing must have been such that a reasonable factfinder would have been compelled to conclude that he was eligible for relief. *See id.* We review *de novo* claims of due process violations in the removal proceedings. *Ramirez–Alejandre v. Ashcroft,* 320 F.3d 858, 869 (9th Cir.2003) (en banc).

## ANALYSIS

### I. Asylum

Congress has given the Attorney General discretion to grant asylum to refugees. *See* 8 U.S.C. § 1158(b). To be eligible for asylum, Khup needed to show that he was unable or unwilling to return to Burma "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Melkonian v. Ashcroft,* 320 F.3d 1061, 1064 (9th Cir.2003) (citing 8 U.S.C. § 1101(a)(42)(A)).

### A. Past Persecution

The IJ found that Khup had not suffered from past persecution, because he had only one serious run-in with the Burmese military (the forced porterage). The IJ concluded that although this "certainly constitutes harassment and discrimination against [Khup] by virtue of his ethnicity and his religious background," it did not rise to the level of persecution. Khup argues that the IJ ignored the anguish he suffered when his fellow preacher was arrested, tortured, and killed and when he was forced to flee the country.

■ Absent a statutory definition, the Ninth Circuit has defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Fisher v. INS,* 79 F.3d 955, 961 (9th Cir.1996) (en banc) (citation omitted). Although persecution is most often associated with a petitioner having suffered severe physical mistreatment, such as beatings or torture, threats can in some instances constitute persecution. *See, e.g., Salazar–Paucar v. INS,* 281 F.3d 1069, 1075 (9th Cir.) (holding that death threats together with beatings of family members and murders of political counterparts constitute

past persecution), *as amended by* 290 F.3d 964 (9th Cir.2002); *see also Thomas v. Ashcroft,* 359 F.3d 1169, 1179 (9th Cir. 2004) (noting that "threats of violence and death are enough to constitute persecution") (internal quotation marks and citation omitted); *Ernesto Navas v. INS,* 217 F.3d 646, 658 (9th Cir.2000) (noting that "[i]n asylum and withholding of deportation cases, we have consistently held that death threats alone can constitute persecution") (citation omitted).

■ Also, "persecution" is not limited to physical suffering. *Kovac v. INS,* 407 F.2d 102, 105–07 (9th Cir.1969); *see also Li v. INS,* 92 F.3d 985, 987 (9th Cir.1996) (noting that "an arrest of a family member at a church may provide the basis for past persecution of petitioner's family on account of religion"); *Kahssai v. INS,* 16 F.3d 323, 329 (9th Cir.1994) (per curiam) (Reinhardt, J., concurring) ("The fact that [petitioner] did not suffer physical harm is not determinative of her claim of persecution: there are other equally serious forms of injury that result from persecution."). Nevertheless, "[p]ersecution ... is an extreme concept that does not include every sort of treatment our society regards as offensive." *Nagoulko v. INS,* 333 F.3d 1012, 1016 (9th Cir.2003) (internal quotation marks and citation omitted).

■ Here, the IJ's finding that Khup's day of forced porterage did not rise to the level of persecution is supported by substantial evidence. The IJ reasoned that Khup did not suffer any ill effects from the episode, and his main reaction was a feeling of injustice at having been made to work on the Sabbath. Although Khup was made to perform hard labor in unpleasant circumstances, the ordeal lasted for less than a day and he gave no indication that he had been seriously abused. Because reasonable minds could differ on whether this single incident constitutes persecution,

the record does not compel a finding that it does. *Cf. Prasad v. INS*, 47 F.3d 336, 339–40 (9th Cir.1995) (holding that a brief detention accompanied by a kick from behind and a blow to the stomach did not compel a finding of past persecution).

■ The IJ did not address, however, whether the arrest, torture, and killing of Khup's fellow preacher, and the terror these acts would have aroused in Khup, constitute past persecution. He and U Myint were together warned by the military not to preach. Khup and U Myint preached together in disregard of the military's warnings. The military subsequently arrested, tortured, and killed U Myint, and dragged his dead body through the streets as an example to others. In addition, the military was looking for Khup as well, and he was forced to go into hiding and flee from village to village before escaping the country. In the absence of an explicit adverse credibility finding, we must accept this testimony as true. *See Shoafera v. INS*, 228 F.3d 1070, 1074–75 & n. 3 (9th Cir.2000). In light of Khup's testimony, a reasonable fact-finder would be compelled to conclude that Khup was a refugee fleeing persecution. *See Salazar–Paucar*, 281 F.3d at 1075 (holding that murders of political allies support a finding of past persecution).

Once an alien establishes that he has suffered past persecution, he is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1) (2002). The burden of proof then shifts to the government to rebut this presumption by showing a fundamental change in circumstances in the country of nationality or that the applicant could avoid future persecution by relocating to another part of the country. *Id.* Normally, we would remand the case to the BIA for a determination of whether the government had met this burden. *See INS v. Ventura*, 537 U.S. 12, 17–

18, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam). In this case, however, after concluding that Khup had not suffered past persecution, the IJ went on to consider whether Khup had an independent and objective well-founded fear of future persecution. Because we conclude that substantial evidence does not support the IJ's determination that Khup failed to demonstrate a well-founded fear of future persecution, *see infra* Part I.B., the question of whether the government has rebutted the presumption based on past persecution is of no practical significance. *See Mendez–Gutierrez v. Ashcroft*, 340 F.3d 865, 870 (9th Cir.2003) (noting that "[a] person may qualify as a refugee '*either* because he or she has suffered past persecution *or* because he or she has a well-founded fear of future persecution' . . . .") (quoting 8 C.F.R. § 208.13(b) (2002)).

## B. Well–Founded Fear of Future Persecution

■ To establish a well-founded fear of future persecution, Khup needed to demonstrate that he subjectively fears persecution and that his fear is objectively reasonable. *See Gormley*, 364 F.3d at 1180. The reasonableness of the fear "must be determined in the political, social and cultural milieu of the place where the petitioner lived[,]" *Montecino v. INS*, 915 F.2d 518, 520 (9th Cir.1990), and "even a ten percent chance of persecution may establish a well-founded fear." *Al–Harbi v. INS*, 242 F.3d 882, 888 (9th Cir.2001) (citation omitted).

Here, the IJ concluded that Khup did not have a subjective fear of persecution, because he obtained a Burmese passport in his own name, renewed it twice while in Malaysia, and never sought asylum at any foreign embassy while he lived in Kuala Lumpur. The IJ also concluded that Khup failed to show that any subjective

fear would be reasonable, as there is no evidence that Khup's family has ever been harassed or even questioned by the military about Khup's whereabouts.

■■■ The IJ's finding is not supported by substantial evidence. Regarding Khup's ability to obtain a passport in his own name, he explained that he had paid a very large sum to a passport broker to buy the passport. *See Garcia–Ramos v. INS,* 775 F.2d 1370, 1374 (9th Cir.1985) (holding that the ability to get a passport *by means of a bribe* "may have little or no relevance to [a] claim of possible persecution"). Khup was never asked to explain how he renewed his passport while in Kuala Lumpur or if he personally went into the Burmese embassy to do so. *See Damaize–Job v. INS,* 787 F.2d 1332, 1336 (9th Cir.1986) (rejecting argument that the petitioner's ability to procure a passport belied his claim of persecution, noting that he "did not personally contact Nicaraguan authorities to obtain his passport, but instead, obtained it through a friend"). Moreover, there is no evidence in the record on which to conclude that the ability to renew a passport signifies that a person does not have a genuine fear of future persecution.

With regard to his failure to apply for asylum, Khup explained that (1) Malaysia did not offer asylum and in fact sent illegal immigrants back to Burma and (2) he did not know that he could apply for asylum at foreign embassies. Finally, although he testified that his family had not had any problems with the military, he explained that it was because, unlike him, they "didn't do anything against the government." *See Jahed v. INS,* 356 F.3d 991, 1001 (9th Cir.2004) (noting that "the fact that [the petitioner's] relatives who remained behind have not been set upon is manifestly irrelevant"). Also, he was nev-

er asked whether the military had questioned his family about his whereabouts.

In light of Khup's credible and consistent explanations of how he obtained his passport and why his family has not been persecuted, and in the absence of any testimony regarding how he renewed his passport, a reasonable fact-finder would be compelled to conclude that Khup has a well-founded fear of future persecution. He testified that the Burmese military had arrested, tortured, and killed his close associate U Myint, had actively sought to arrest Khup as well, and had arrested, imprisoned, and tortured U Thawng Lang upon his return to Burma. We therefore hold that Khup is eligible for asylum and remand for the Attorney General to make a discretionary decision regarding whether to grant asylum.

## II. Withholding of Removal

■■■ "To qualify for withholding of removal, an alien must demonstrate that it is more likely than not that he would be subject to persecution on one of the specified grounds." *Al–Harbi,* 242 F.3d at 888 (internal quotation marks and citation omitted). The IJ denied Khup's application for withholding on the ground that he had failed to meet the lower "reasonable probability of persecution" standard for asylum and therefore necessarily also failed to meet the "more likely than not" standard for withholding.

■■■ The IJ's determination on Khup's eligibility for withholding of removal is not supported by substantial evidence. As we discuss in greater detail in Part III, *infra,* no reasonable fact finder could conclude that Khup did not face at least a 51% chance of religious and political persecution were he to return to Burma. The torture and killing of U Myint by government forces, the government's pursuit of Khup, the torture of Khup's preacher asso-

ciate who returned to Burma, and the long and well-documented history of human rights abuses by the Burmese government as set forth in the administrative record simply do not permit any other conclusion.

■ We note that this case differs from one in which the agency has made an adverse credibility finding that is not supported by substantial evidence. There, the reviewing court must in most instances remand the case to the BIA to allow it the first opportunity to assess the applicant's statutory eligibility for relief. *See Ventura*, 537 U.S. at 17–18, 123 S.Ct. 353 (holding that when the BIA has not yet considered an issue, remand is the proper course). Here, by contrast, the IJ found that Khup *was* a credible witness and went on to conclude that he nevertheless failed to establish eligibility for asylum or withholding. Because the IJ already considered Khup's eligibility for withholding in the first instance, it is unnecessary to remand this issue to the BIA. *See Baballah v. Ashcroft*, 335 F.3d 981, 992 (9th Cir. 2003) (deciding withholding claim in case where the agency determined that the petitioner's ill-treatment did not rise to the level of persecution), *as amended by* 367 F.3d 1067 (9th Cir.2004); *cf. Guo v. Ashcroft*, 361 F.3d 1194, 1204 (9th Cir.2004) (holding that "[b]ecause the IJ found that '[e]ven if [Mr. Guo] has testified [credibly],' he did not suffer past persecution, we are not required to remand under *Ventura* for a determination on that issue") (citation omitted); *Li v. Ashcroft*, 356 F.3d 1153, 1161 n. 7 (9th Cir.2004) (en banc) (declining to remand on issue of statutory eligibility for asylum where the BIA "reviewed all the evidence, found the claimant's testimony credible, and considered whether Li's actions were on account of resistance to a coercive population control policy").

Nevertheless, in two of our recent decisions, we have remanded cases for the BIA to reconsider withholding of removal claims even after the agency had explicitly or implicitly determined the applicant to be ineligible for relief. *See Lopez v. Ashcroft*, 366 F.3d 799, 807 & n. 5 (9th Cir. 2004); *Jahed*, 356 F.3d at 996, 1001. *Lopez* is distinguishable, however, because there the panel granted review on the issue of past persecution and the resulting presumption of future persecution. 366 F.3d at 807. It was therefore proper to remand to the agency to determine in the first instance whether there had been a fundamental change in country conditions.

In *Jahed*, the panel decided to remand the withholding claim after concluding that the petitioner had established past persecution *and* a well-founded fear of future persecution. 356 F.3d at 1001. We do not believe, however, that *Jahed* established a rule that remand is necessary even when the agency has reviewed all of the relevant evidence and found it to be insufficient to meet the standard for withholding. *See Li*, 356 F.3d at 1161 n. 7. Moreover, because we conclude that Khup is entitled to withholding of removal under Article 3 of the CAT, *see infra* Part III, Khup's eligibility for withholding of removal under 8 U.S.C. § 1231(b)(3) is somewhat academic.

### III. Convention Against Torture

The IJ also denied Khup's application for withholding under Article 3 of the CAT on the grounds that Khup failed to show that it is more likely than not that the Burmese government would torture him should he be returned to Burma. *See* 8 C.F.R. § 208.16(c) (2002).

■ The CAT standard is narrower than the asylum standard, because an applicant must show that it is "more likely than not" that he will be tortured. *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir.2001). The standard is also broader, however, because the petitioner does not

need to show that the torture is on account of a statutorily protected ground. *Id.* In order to qualify for relief under the CAT, Khup would need to present evidence

> establishing substantial grounds for believing that he ... would be in danger of being subjected to torture in the country of removal, including (but not limited to) evidence of past torture inflicted upon the applicant; gross, flagrant or mass violations of human rights within the country of removal; and other relevant information regarding conditions in the country of removal.

*Id.* at 1284 (internal quotation marks and citations omitted). Thus, in addition to claims of past persecution, an IJ must consider evidence of current country conditions. *Id.*

Here, in addition to Khup's testimony regarding his own past persecution, the IJ noted that Khup had submitted "a plethora of documents which confirm the harassment and persecution, and at times torture and killing of individuals in the Chin and Kachin province [sic.] by the Burmese government as a result of the religious beliefs and activities of the primarily Christian people living in these areas." Included in this documentation are, for example, an Amnesty International press release from December 2000 that states "[t]orture has become an institution in [Burma], used throughout the country on a regular basis . . .," and a 1999 State Department report on religious freedom in Burma that states "[g]overnment security forces continued efforts to . . . prevent Christian Chin from proselytizing by highly coercive means, including . . . by arresting, detaining, interrogating, and physically abusing Christian clergy." The same report describes various incidents of *government abuse of Christian clergy, including beatings, killings, and a mutilation.*

For its part, the government submitted a 2000 State Department country conditions report on Burma. The report confirms the Burmese government's use of torture against prisoners and detainees and states that the authorities reportedly beat Christian clergy who refuse to stop preaching. The government also submitted a September 1998 State Department report on Burma entitled "Profile of Asylum Claims and Country Conditions." This report states that "assertions that [Christians] have been tortured or imprisoned purely on the basis of religion should be viewed with care." Although Khup testified that he was never a member of the pro-democracy movement, his asylum application states that the Burmese government imputed this political opinion to him: "The government believed that our evangelism was connected to the pro-democracy movement" and "I cannot return to [Burma] because I am on the [Military Intelligence]'s list of *political* dissidents" (emphasis added). Finally, the government submitted a 2001 State Department report on religious freedom in Burma. The report describes arrests and beatings of Christian clergy in Chin State.

■ The record compels a conclusion that Khup faces at least a 51% chance of being tortured should he be removed to Burma. He testified that U Myint was arrested and tortured, that the military sought to arrest Khup too, and that his preacher friend was arrested and tortured upon his return to Burma. In addition, *the country conditions reports submitted by both parties indicate that the Burmese government regularly tortures detainees and that Christian preachers have been subject to arrest and detention.* We therefore hold that Khup is entitled to withholding of removal under Article 3 of the CAT.

## IV. Streamlining

Finally, Khup argues that the BIA violated his due process rights by deciding to streamline his appeal because (1) the BIA did not consider all of his arguments and (2) the BIA failed to follow its own streamlining regulations. Khup's first argument is precluded by *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 852 (9th Cir.2003). We need not address Khup's second argument because we are granting his petition for review. *See Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1253 (9th Cir.2004).

### CONCLUSION

We grant Khup's petition for review and remand to the BIA for further proceedings consistent with our opinion.

**PETITION FOR REVIEW GRANTED.**