Dagoberto Hermes SALAZAR–
PAUCAR, Petitioner,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

Nos. 99–71306, 00–70811.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 15, 2001.

Filed Feb. 28, 2002.

---

Gary Finn, Indio, California, for the petitioner.

James A. Hunolt, Heather R. Phillips, United States Department of Justice, Of-

fice of Immigration Litigation, Washington, D.C., for the respondent.

■■■■■■■■■■■■■■■■■■■■■

Before: WARDLAW, PAEZ, and TALLMAN, Circuit Judges.

## OPINION

PAEZ, Circuit Judge.

Petitioner Dagoberto Hermes Salazar-Paucar petitions for review of a Board of Immigration Appeals ("BIA") decision denying his application for asylum and withholding of deportation. He asserts that the BIA erred in concluding that he did not suffer past persecution by the Sendero Luminoso (also known as the Shining Path) guerrillas in Peru when he received multiple death threats, his parents were beaten, and the other members of the town government in his position were murdered by the guerrillas. He also contends that the BIA erred in concluding that he no longer had a well-founded fear of persecution; the BIA relied on the fact that Petitioner lived "unmolested" away from his hometown for eighteen months, that there were changed conditions in Peru, and the seven years since Petitioner left Peru. We hold that the evidence compels a finding of past persecution and that the Immigration and Naturalization Service ("INS") failed to rebut the presumption of future persecution. Accordingly, we grant Salazar-Paucar's petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner is a native and citizen of Peru who entered the United States without inspection in October 1992. He seeks asylum and withholding of deportation for alleged persecution by the Shining Path guerrillas in Peru. The Shining Path is an armed Maoist revolutionary group that seeks to overthrow the Peruvian government by force. A 1991 report by Amnesty International indicated that the Shining Path had tortured and killed thousands of Peruvians, frequently subjecting its victims to mock trials before executing them.

In 1989, Petitioner was elected one of four barrio presidents in his hometown of San Pedro de Cajas, Peru. His duties were roughly equivalent to a city councilperson and concerned town maintenance and various administrative matters. Petitioner testified at his asylum hearing that, as a result of his position as a barrio president, he received threats from the Shining Path through a third party stating that persons in authority should resign or risk death. He also testified that death threats, some of which identified him by name, were painted in the town's main square.

In April 1990, the Shining Path guerrillas murdered the mayor of San Pedro de Cajas, from whom Petitioner took orders as a barrio president. Shortly thereafter, the Peruvian army formed a local defense group in Petitioner's town, the "Rondas Campesinas," of which Petitioner and the three other barrio presidents were leaders by virtue of their municipal positions. Petitioner testified that he remained a leader of the Rondas Campesinas even though it was viewed as an act of defiance toward the Shining Path.

While Petitioner was on a trip in December 1990, some 30 to 40 Shining Path guerrillas came to San Pedro de Cajas with a list of 25 people that they were targeting. Petitioner testified that he believed that his name was on the list because the Shining Path guerrillas went to his house to look for him, broke down the front door, and beat his father and mother when they learned that he was not there. The Shining Path took eight people whose names appeared on the list to the town

square, where they held a mock trial and then summarily executed the eight individuals by shooting them against a town wall. This event was documented in several newspaper articles submitted by Petitioner and corroborated by eye witness testimony at his asylum hearing. Petitioner's father-in-law and one of the four barrio presidents were among those who were murdered.

Two days after attending the victims' funerals, Petitioner, along with his parents and siblings, fled to Lima, the capital of Peru. For the next one and one-half years, Petitioner had no interaction with the Shining Path. Then, in July 1992, he found a death threat painted on the wall of his house in Lima. The threat did not mention Petitioner by name but included general language threatening death to the "enemies of the town." The painting also included the symbol of the Shining Path—a rifle and sickle—and a reference to the group's leader. A few weeks later, Petitioner learned from friends that the two remaining barrio presidents had been murdered that month after they fled San Pedro de Cajas to other regions of Peru.

Two weeks later, Petitioner fled Peru out of fear that the Shining Path would find and kill him.[1] Petitioner entered the United States without inspection at Brownsville, Texas, in October 1992. Three days after his arrival in the United States, the INS issued an Order to Show Cause charging Petitioner as deportable for entering without inspection. Petitioner then applied for asylum and withholding of deportation. After several hearings in which Petitioner and one other witness testified, the Immigration Judge ("IJ") issued an oral decision denying Petitioner's application.

Petitioner then appealed to the BIA, which did not issue a decision until September 1999, six years later. The BIA found that Petitioner "testified credibly that he has a fear of being kidnaped or killed by the Shining Path guerrillas." Although the BIA did not find that Petitioner had expressed any political opinion, it found that the Shining Path had imputed a political opinion to him.

The BIA concluded, however, that Petitioner failed to establish that he was eligible for asylum because he "ha[d] not established past persecution or a well-founded fear of persecution if returned to his native country." First, it noted that Petitioner had lived "unmolested" for eighteen months in Lima. Although a death threat had been painted on the wall of Petitioner's house in Lima, the BIA found no evidence that the threats were directed at Petitioner or that Petitioner had been harmed in any way. Thus, the BIA concluded, Petitioner's fear of persecution was not countrywide.

Second, the BIA relied on the passage of time, not only between the incidents and the hearing before the IJ, but also in the following six years during which Petitioner's case was pending before the BIA.

Third, the BIA concluded that, even assuming that Petitioner had established past persecution, the INS had successfully rebutted the presumption by demonstrating changed country conditions and the passage of time. The BIA found that the 1992 arrest of the Shining Path's leader, Abimael Guzman, "len[t] credibility to Peru[vian] President Fujimori's claim that the counter-insurgency strategy is leading to the pacification of the country, and ... that internal divisions in the guerrilla or-

---

1. Petitioner's family remained in Lima, Peru, and, as of the asylum hearing in 1993, had not been harmed by the Shining Path since December 1990, although Petitioner testified that they live in constant fear.

ganization have further weakened that organization's capacity to carry out sustained armed attacks."

Thus, after an independent review of the record, the BIA affirmed the IJ's denial of asylum and withholding of deportation. The BIA then dismissed Petitioner's appeal, granted him 30 days to voluntarily depart, and otherwise ordered him deported. This appeal followed.

While this appeal was pending, Petitioner filed a motion to reopen to apply for suspension of deportation. The BIA denied the motion on the ground that the "stop time rule" applied to Petitioner and therefore he failed to establish prima facie eligibility for suspension of deportation. Petitioner also appeals this decision.

## II. JURISDICTION

We have jurisdiction under § 106(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1105a(a)(1), as amended by the transitional rules for judicial review under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104–208, 110 Stat. 3009 (Sept. 30, 1996). *Cruz–Navarro v. INS*, 232 F.3d 1024, 1026 (9th Cir.2000).[2]

## III. STANDARD OF REVIEW

■ When the BIA conducts a de novo review of the IJ's decision, as here, we review the BIA's decision rather than the IJ's, except to the extent that the BIA expressly adopts the IJ's ruling. *Cordon–Garcia v. INS*, 204 F.3d 985, 990 (9th Cir.2000) (citing *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir.1995)). We must uphold the BIA's decision if it is "supported by reasonable, substantial, and probative

evidence on the record considered as a whole." *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). However, "[the BIA's] decision must be reversed if a reasonable factfinder would have to conclude that the requisite persecution or fear has been shown." *Tagaga v. INS*, 228 F.3d 1030, 1034 (9th Cir.2000).

## IV. DISCUSSION

### A. Eligibility for Asylum

■ An alien is eligible for asylum if he establishes that he is a "refugee," which is an alien who is unable or unwilling to return to his home country because of a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Tagaga*, 228 F.3d at 1033; *Navas v. INS*, 217 F.3d 646, 654 (9th Cir.2000). The Attorney General has the discretion to grant asylum to an eligible applicant. *Tagaga*, 228 F.3d at 1033; *Navas*, 217 F.3d at 654.

■ A well-founded fear of future persecution must be both "subjectively genuine" and "objectively reasonable." *Cordon–Garcia*, 204 F.3d at 990. The subjective component may be satisfied by the applicant's testimony. *Id.* We must accept the applicant's testimony as true if, as here, the petitioner is found to be credible or there is no explicit adverse finding of credibility. *Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir.2000).

■ There are two ways in which to establish the objective component of fear of future persecution. First, if an appli-

---

**2.** The transitional rules apply in this case because Petitioner's deportation proceedings began on October 16, 1991, and the BIA issued a final order of deportation on September 14, 1999. *Cruz–Navarro*, 232 F.3d at 1026 n. 2; *Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir. 1997).

cant establishes past persecution, it triggers a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i) (1999);[3] *Reyes–Guerrero v. INS*, 192 F.3d 1241, 1244—45 (9th Cir.1999). The INS can rebut this presumption by demonstrating by a preponderance of the evidence that the conditions in the applicant's home country have changed such that he or she no longer has a well-founded fear of being persecuted. 8 C.F.R. § 208.13(b)(1)(i) (1999); *Reyes–Guerrero*, 192 F.3d at 1245. "Second, an applicant can show a good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution," with either documentary evidence or credible testimony. *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir.1999).

■ There is a more stringent standard for withholding of deportation than there is for establishing asylum. *Rivera–Moreno v. INS*, 213 F.3d 481, 485 (9th Cir. 2000); *Kazlauskas v. INS*, 46 F.3d 902, 907 (9th Cir.1995) ("An applicant only qualifies for a withholding of deportation if he shows a 'clear probability of persecution' upon return to his country of origin."). However, while the granting of asylum is discretionary, the Attorney General must withhold deportation "if the evidence demonstrates a clear probability that the applicant would be persecuted were he to be deported to his home country...." *Duarte de Guinac*, 179 F.3d at 1159.

Neither the BIA nor the INS here challenged Petitioner's subjective fear of persecution by the Shining Path. Nor is it disputed that Petitioner's alleged persecution was on account of his imputed political opinion. Although the BIA focused on whether Petitioner had a well-founded fear of future persecution, we find that he has established past persecution. Because a showing of past persecution raises a rebuttable presumption of a well-founded fear of future persecution, and the government has not rebutted this presumption, we need not address whether Petitioner has demonstrated a fear of future persecution.

## B. Past Persecution

■ The evidence in the record compels a finding of past persecution. We have held that death threats by the Shining Path guerrillas in Peru constitute past persecution. *Gonzales–Neyra v. INS*, 122 F.3d 1293, 1296 (9th Cir.1997). In *Gonzales–Neyra*, the asylum petitioner ceased paying protection money to the Shining Path after he discovered that the extortionists were not policemen because he did not support their ideology. *Id.* at 1294–95. The Shining Path threatened the lives of petitioner and his brother, but neither one suffered physical harm. *Id.* Despite the fact that neither the petitioner nor his family was physically harmed, we found that the petitioner was eligible for asylum and entitled to withholding of deportation. *Id.* at 1296–97.

As in *Gonzales–Neyra*, Petitioner's life was threatened but he did not suffer physical harm. There is compelling evidence that the Shining Path guerrillas threatened Petitioner with death for his civic role as a barrio president and that the Shining Path would not hesitate to carry out its threats. Petitioner received, through both third parties and paintings in the town square, multiple threats that he should

---

**3.** We apply the regulations as they existed at the time of the BIA's decision. *Ortiz v. INS*, 179 F.3d 1148, 1156 (9th Cir.1999).

resign his position of authority or risk death.

Additionally, the Shining Path guerrillas beat Petitioner's father and mother when they could not find Petitioner at his house. Such evidence of harm to Petitioner's family supports a finding of past persecution. *Lim v. INS*, 224 F.3d 929, 936–37 (9th Cir.2000); *see also Gonzalez v. INS*, 82 F.3d 903, 909 (9th Cir.1996) ("The violence actually committed against other members of Mrs. Gallegos's family, and repetition of threats to her, made her fear of violence well founded.").

That the Shining Path guerrillas murdered Petitioner's political allies further supports our conclusion. The Shining Path guerrillas killed the mayor, Petitioner's superior. They also publicly executed eight of the 25 people that they sought in Petitioner's town because of their participation in the town government. The Shining Path guerrillas murdered the three other barrio presidents in San Pedro de Cajas, even after two of them had fled the town. Evidence of harm to individuals who held the same political positions to Petitioner's, similar to the harm to Petitioner's family, also supports a finding of past persecution.

In sum, the death threats that Petitioner received combined with the harm to members of his family and the murders of his political counterparts compel a finding of past persecution.

We disagree with the BIA's assertion that certain factors undermine Petitioner's claims. *Cf. Lim*, 224 F.3d at 937. The BIA concluded that the Shining Path ceased to be a threat to Petitioner after he left San Pedro de Cajas for Lima, because Petitioner lived "unmolested" in Lima for nearly two years. It is true that Petitioner lived in Lima without incident for more than eighteen months after his arrival. In July 1992, however, Petitioner discovered a death threat directed to the "enemies of the people" along with the symbol of the Shining Path painted on the wall of his house in Lima. The BIA dismissed this incident because "it [wa]s not clear from the record that the slogans that were painted on the house in Lima were actually directed at [Petitioner] or someone else." Although it is theoretically possible that the painting was nothing more than random graffiti, this is unlikely for several reasons. The painting was on Petitioner's house—not a wall elsewhere in the neighborhood or even at his place of work. It was reasonable for Petitioner to conclude that the Shining Path was responsible for the death threat painted on his house and that it was directed at him because, in San Pedro de Cajas, he had been the target of death threats painted in the town square and had received death threats from the Shining Path through a third party. Further, the Shining Path had beaten his parents and had executed eight townspeople, including one of the barrio presidents. Thus, Petitioner had a reasonable basis upon which to believe that the Shining Path still hunted him. His fears were confirmed later that July when he learned that, during that very month, the Shining Path had killed the remaining two barrio presidents who had fled San Pedro de Cajas to other parts of Peru.

Thus, that Petitioner lived "unmolested" in Lima does not change our conclusion that Petitioner has suffered past persecution. Indeed, the threat on his Lima home provides affirmative evidence to support his claim. This incident demonstrates that the threat to Petitioner was not limited to San Pedro de Cajas but existed countrywide—an assertion supported by a 1993 Amnesty International report of multiple car bombings by the Shining Path in Lima.

Despite the compelling evidence of past persecution, the BIA, without any factual

or legal analysis, concluded that Petitioner had not suffered past persecution. Although we will remand a matter to the BIA if it simply issues a "boilerplate" ruling with conclusory statements devoid of specific factual analysis, *Ghaly*, 58 F.3d at 1430, we generally do not remand when "on the record before us, it is clear that we would be compelled to reverse [the BIA's] decision if it had decided the matter against the applicant." *Navas*, 217 F.3d at 662. Thus, because "the ultimate outcome is clear" here, remand is inappropriate. *Id.*

## 1. The INS's Rebuttal Evidence

The BIA found that, even assuming Petitioner established past persecution, the INS effectively rebutted the presumption of future persecution. The BIA relied on a 1993 Amnesty International report, concluding that conditions in Peru had changed such that the Shining Path was no longer a threat to Petitioner, and the fact that seven years had passed since Petitioner fled Peru. We disagree.

 To properly rebut the presumption of a well-founded fear of persecution, the INS must "show by a preponderance of the evidence that country conditions have changed to such an extent (as applied to the individual's case) that the applicant no longer has a well-founded fear that he would be persecuted if he were to return." *Navas*, 217 F.3d at 657; *see also Borja v. INS*, 175 F.3d 732, 738 (9th Cir.1999) (en banc) ("Our cases hold that individualized analysis of how changed conditions will affect the specific petitioner's situation is required. Information about general changes in the country is not sufficient." (quoting *Garrovillas v. INS*, 156 F.3d 1010, 1017 (9th Cir.1998)) (internal quotation marks omitted)).

 The INS proffered no evidence of changed country conditions. Rather, the BIA relied exclusively on the 1993 Amnesty International report submitted by Petitioner. The BIA concluded from this report:

> [T]he arrest of Abimael Guzman, the leader of the Shining Path guerrilla group in 1992 lends credibility to Peru[vian] President Fujimori's claim that the counter-insurgency strategy is leading to the pacification of the country, and [the report] notes that internal divisions in the guerrilla organization have further weakened that organization's capacity to carry out sustained armed attacks.

The Amnesty report, however, does not support these conclusions. While it notes that Abimael Guzman was arrested in 1992, the report details the Shining Path's torture and murder of political opponents in 1992 and 1993, as well as car bombings in Lima in July 1992 and January 1993. It also describes an attack on a town in October 1992, which had a civil defense force similar to the one in Petitioner's town, in which forty-seven peasants were killed, including fourteen children.

Additionally, the "internal divisions" cited by the BIA refer not to the Shining Path, but to another guerrilla organization, the Tupac Amaru Revolutionary Movement. In short, nothing in the report lends any credence to former President Fujimori's claim that the new counter-insurgency strategy is succeeding against the Shining Path. Indeed, the report treats former President Fujimori's claim skeptically by using phrases such as "[t]he president has gone so far as to say . . . ."

Thus, no reasonable factfinder could conclude on the basis of the 1993 Amnesty report that conditions had changed in Peru to such an extent that Petitioner no longer has a well-founded fear that he would be persecuted if he were to return. *See*

*Meza–Manay v. INS*, 139 F.3d 759, 765 & n. 8 (9th Cir.1998) (concluding that the INS failed to rebut the presumption of a well-founded fear of future persecution in part because a 1995 report on Peru stated that although" '[t]he conflict between the government and the main internal terrorist group, the Shining Path ..., slowed noticeably in 1993[ ]' after the arrest of several Shining Path leaders, including Abimael Guzman, ... '[b]y late 1994 ... the guerrilla/terrorist conflict continued' "); *see also Kataria*, 232 F.3d at 1115 (holding that country conditions profile, which reflected a decline in, but persistence of, arrests and killings, was insufficient to rebut the presumption).

In determining that the INS rebutted the presumption, the BIA also relied on the passage of time—seven years since Petitioner left Peru, six of which were due to the BIA's delay in ruling on Petitioner's claim. The BIA reasoned that the Shining Path could no longer be interested in Petitioner after this length of time. This conclusion, however, is nothing but speculation and is wholly unsupported by the record. Neither the INS nor the BIA cited any authority for the proposition that the passage of time alone can rebut the presumption of future persecution. It would be fundamentally unfair to permit the BIA to rebut the presumption of persecution by relying on its own administrative delay in processing the claims of petitioners.

Because the INS failed to rebut the presumption of a well-founded fear of persecution, Petitioner has demonstrated that he is eligible for asylum.

**2. Withholding of Deportation**

█ Because Petitioner established that he suffered past persecution such that his life was threatened in Peru on account of his imputed political opinion, a presumption arises that he is entitled to withholding of deportation. *Duarte de Guinac*, 179 F.3d at 1164; 8 C.F.R. § 208.16(b)(2) (1999); *see also Surita v. INS*, 95 F.3d 814, 821 (9th Cir.1996) ("Some forms of past persecution ... trigger a presumption that the applicant is entitled to withholding of deportation. If an applicant's 'life or freedom was threatened in the proposed country of deportation, ... it shall be presumed that[her] life or freedom would be threatened on return to that country.' ") (alteration in original) (quoting 8 C.F.R. § 208.16(b)(2) (1999)). The INS did not demonstrate by a preponderance of the evidence that conditions in Peru have changed to such an extent that it is no longer more likely than not that Petitioner would be persecuted there, and thus it failed to rebut the presumption. *Duarte de Guinac*, 179 F.3d at 1164 (citing 8 C.F.R. § 208.16(b)(2) (1999)). Accordingly, Petitioner is entitled to withholding of deportation.

**V. CONCLUSION**

We grant the petition for review and reverse the BIA's denial of Petitioner's application for asylum and withholding of deportation in case number 99–71306. The case is remanded to the BIA for a grant of asylum. The application for withholding of deportation is also granted.

Because we grant this petition, the subsequent Petition for Review of Deportation Order in case number 00–70811 is dismissed as moot.

No. 99–71306—PETITION GRANTED AND REMANDED.

No. 00–70811—DISMISSED.