# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HOSSEIN NAHRVANI,
                              *Petitioner,*

v.

ALBERTO GONZALES,* Attorney
General,
                              *Respondent.*

No. 03-70586

Agency No.
A75-654-655

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
August 6, 2004—Pasadena, California

Filed March 7, 2005

Before: Betty B. Fletcher, David R. Hansen,** and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson;
Dissent by Judge B. Fletcher

---

*Alberto Gonzales is substituted for his predecessor, John Ashcroft, as
Attorney General. Fed. R. App. P. 43(c)(2).

**The Honorable David R. Hansen, Senior U.S. Circuit Judge for the
Eighth Circuit, sitting by designation.

**COUNSEL**

Louis A. Gordon, Los Angeles, California, for the petitioner.

Daniel E. Goldman (briefed), Earle B. Wilson (argued), Office of Immigration Litigation, Washington, D.C., for the respondent.

**OPINION**

RAWLINSON, Circuit Judge:

Hossein Nahrvani, a native of Iran, petitions for review of the Board of Immigration Appeals' (BIA) summary affirmance of the Immigration Judge's (IJ) denial of his request for asylum from Iran and his request for withholding of

removal and protection under the Convention Against Torture (CAT) as to Germany. The IJ granted withholding of removal and protection under the CAT as to Iran. Because the IJ's determinations were supported by substantial evidence, we deny the petition.

## I.

### *BACKGROUND*

Nahrvani entered the United States on or about April 15, 1999. Approximately one year later, the Immigration and Naturalization Service (INS) issued Nahrvani a Notice to Appear alleging that he was removable under Section 237(a)(1)(B) of the Immigration and Naturalization Act for remaining in the United States longer than was permitted. Nahrvani conceded removability, but submitted an application for asylum and withholding of removal. In the alternative, Nahrvani requested that the case be reviewed under the CAT.

In support of his application, Nahrvani testified that, while living in Iran, he was arrested and jailed for approximately two years as a result of his participation in an anti-government demonstration. During his incarceration, Nahrvani was repeatedly tortured. He fled to Germany in 1989, where he was granted political asylum and permanent residency.

Nahrvani lived in Germany for approximately ten years. During that time, Nahrvani owned a car, and traveled and worked without restriction. Nahrvani converted to Christianity and married a German Lutheran pastor. Nahrvani sought German citizenship, but was informed that he must first renounce his Iranian citizenship. Nahrvani completed the necessary paperwork at the Iranian Consulate to renounce his citizenship, but never attained German citizenship.

As a result of his conversion to Christianity and his efforts to renounce his Iranian citizenship, Nahrvani became the tar-

get of harassment and threats, and his bicycle and car were damaged. He testified that officials from the Iranian Consulate were "chasing" him and stealing his possessions. Nahrvani reported these incidents to the German police without providing the police with specific names of individual perpetrators. Nahrvani's wife testified that the German police investigated the complaints, but were ultimately unable to solve the crimes.

The IJ found Nahrvani's testimony to be credible. Based on Nahrvani's testimony, the IJ determined that, due to his Christian beliefs, Nahrvani would face persecution if returned to Iran. Although the IJ denied Nahrvani's asylum claim because he was firmly resettled in Germany, the IJ granted Nahrvani's request for withholding of removal and CAT relief from Iran.

The IJ denied Nahrvani's request for asylum from Germany on the basis that Nahrvani had failed to establish a well-founded fear of future persecution in Germany. Specifically, the IJ determined that Nahrvani had not established that the German government was unwilling or unable to protect him from the alleged persecution. For similar reasons, the IJ denied Nahrvani's requests for withholding of removal and CAT relief.

The BIA affirmed the IJ's denial of asylum without opinion. Nahrvani filed a timely petition for review.

## II.

### *STANDARDS OF REVIEW*

Because the BIA affirmed the IJ's ruling without an opinion, the IJ's decision is the final agency action for purposes of this appeal. *See Falcon Carriche v. Ashcroft,* 350 F.3d 845, 851 (9th Cir. 2003). The IJ's determination that Nahrvani is ineligible for asylum "can be reversed only if the evidence presented by [Nahrvani] was such that a reasonable factfinder

would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992) (citation omitted). To reverse the IJ's finding, we "must find that the evidence not only supports that conclusion, but compels it[.]" *Id.* at 481 n.1. To that end, "[t]he [IJ's] decision need only be supported by substantial evidence." *Gonzalez-Hernandez v. Ashcroft*, 336 F.3d 995, 998 (9th Cir. 2003) (citation omitted). "This is a highly deferential standard of review." *Marcu v. INS*, 147 F.3d 1078, 1080-81 (9th Cir. 1998).

## III.

### *DISCUSSION*

#### *A.  Iran*

**[1]** Nahrvani bears the burden of proof with respect to his eligibility for asylum from Iran. 8 C.F.R. § 208.13(a). An application for asylum must be denied if the alien has firmly resettled in another country. 8 C.F.R. § 208.13(c)(2)(B). "Firm resettlement" is defined in 8 C.F.R. § 208.15 as follows:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
>
> (a)  That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

(b)   That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

**[2]** The IJ did not err in denying Nahrvani's request for asylum from Iran. The evidence substantially supports the IJ's conclusion that Nahrvani established deep and significant ties to Germany during his ten-year residence in the country. Nahrvani was granted permanent residency in Germany and renounced his Iranian citizenship in an attempt to gain German citizenship. *See Andriasian v. INS*, 180 F.3d 1033, 1043 (9th Cir. 1999) (stating that an alien has firmly resettled within the meaning of 8 C.F.R. § 208.15 "if a third country in which the alien has resided after becoming a refugee offers him permanent resettlement[.]"). Nahrvani married a German citizen, worked and traveled freely throughout the country, and practiced Christianity openly. Nahrvani made no showing that the conditions of his ten-year residence in Germany were so "substantially and consciously restricted by [the German authorities] that he . . . was not in fact resettled." 8 C.F.R. § 208.15(b). As the IJ's finding of firm resettlement in Germany is supported by substantial evidence, Nahrvani's request for asylum from Iran must be denied.

## B. Germany

Nahrvani requested asylum from both Iran and Germany, and the IJ addressed the issue of asylum from both countries.[1]

[3] "[T]o be eligible for asylum, an applicant must establish either past persecution or a well-founded fear of present persecution on account of a protected ground."[2] *Singh v. INS*, 362 F.3d 1164, 1170 (9th Cir. 2004) (citation, alteration, and internal quotation marks omitted).

To establish a well-founded fear of persecution, an applicant must show that his fear is "both subjectively genuine and objectively reasonable." *Gormley v. Ashcroft*, 364 F.3d 1172, 1180 (9th Cir. 2004) (citation omitted). "The subjective component may be satisfied by credible testimony that the applicant genuinely fears persecution." *Id.* (citation omitted). "The objective component of this test requires showing, by credible, direct, and specific evidence in the record, that persecution is a reasonable possibility." *Agbuya v. INS*, 241 F.3d 1224, 1228 (9th Cir. 2001) (citation and internal quotation marks omitted). "This showing may be made by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant." *Id.* (citation and internal quotation marks omitted).

[4] We have characterized "persecution as an extreme concept, marked by the infliction of suffering or harm in a way regarded as offensive." *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc) (citation, alteration, and internal

---

[1]Neither the IJ or BIA addressed the issue of whether an alien may request asylum from a country of which he is not a citizen. At least one court has ruled that an alien may seek asylum from the country of resettlement. *See Rife v. Ashcroft*, 374 F.3d 606 (8th Cir. 2004). We need not resolve this issue to decide this case.

[2]Nahrvani appeals the denial of asylum from Germany on the basis that he had a well-founded fear of future persecution.

quotation marks omitted). Physical violence inflicted against an individual often "meets the requirement of severity that characterizes persecution[.]" *Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 n.5 (9th Cir. 2003) (citation omitted); *see also Duarte de Guinac v. INS*, 179 F.3d 1156, 1161 (9th Cir. 1999) ("we have consistently found persecution where, as here, the petitioner was physically harmed . . .") (citations omitted). Although death threats against an individual may be sufficient to constitute persecution, *see Khup v. Ashcroft*, 376 F.3d 898, 903 (9th Cir. 2004), most threats do not rise to the level of persecution. *See Hoxha*, 319 F.3d at 1182 (characterizing unfulfilled threats as harassment rather than persecution); *see also Lim v. I.N.S*, 224 F.3d 929, 936 (9th Cir. 2000) ("Threats themselves are sometimes hollow and, while uniformly unpleasant, often do not effect significant actual suffering or harm.").

[5] The pivotal issue in this case is whether the incidents described in Nahrvani's testimony and asylum application meet the high standard required to prove persecution. Although Nahrvani described several incidents in Germany of harassment, threats, and property damage, the record reflects that he suffered only *de minimis* property damage and anonymous, ambiguous threats. Nahrvani suffered no physical harm nor was he ever detained.

Nahrvani did receive a couple of serious threats. One phone call stated: "It is Halal to shed your blood[,]" and one note threatened that people who abandoned Islam would "have to die."

[6] While "especially menacing death threats" may constitute persecution in "certain extreme cases," *Lim*, 224 F.3d at 936, this is not such an extreme case. Nahrvani received only telephone or written threats, and never had a personal confrontation with any of the people threatening him.[3] *See id.*

---

[3]Although Nahrvani testified that he was chased by officials from the Iranian Consulate, he did not provide any details regarding the incident.

("Neither [petitioner] nor his family was ever touched, robbed, imprisoned, forcibly recruited, detained, interrogated, trespassed upon, or even closely confronted."); *compare Ruano v. Ashcroft*, 301 F.3d 1155, 1160 (9th Cir. 2002) (finding persecution where petitioner was threatened by men who had "closely confronted" him and drawn their pistols in his presence). In contrast, the threats Nahrvani received were anonymous, vague, and did not create a sense of immediate physical violence. *See Lim*, 224 F.3d at 936-37. Additionally, while we have acknowledged that threats of death are enough to constitute persecution, we typically rely on all of the surrounding events, including the death threat, in deciding whether persecution exists. *See Salazar-Paucar v. INS*, 281 F.3d 1069, 1075 (9th Cir. 2002) (finding that death threats "combined with" multiple events, including harm to the applicant's family and murders of the applicant's political counterparts, constituted persecution); *see also Reyes-Guerrero v. INS*, 192 F.3d 1241, 1243-44 (9th Cir. 1999) (describing repeated bribe attempts, personal confrontations, and death threats); *Sangha v. INS*, 103 F.3d 1482, 1486-87 (9th Cir. 1997) (involving an attack on the petitioner's family, personal confrontation, and death threats). Other than the two specific threats described above, the incidents Nahrvani related do not significantly bolster his persecution claim. "Because reasonable minds could differ" as to whether the threats received by Nahrvani constituted persecution, the record does not compel us to make a finding that the threats did constitute persecution. *Khup*, 376 F.3d at 903.

**[7]** Nahrvani has also failed to demonstrate that the acts of which he complains were "committed by the government or forces the government is either 'unable or unwilling' to control." *Ernesto Navas*, 217 F.3d at 655-56. Nahrvani contends that the German police continually failed to investigate his reports of mistreatment. However, the record regarding these assertions is far from compelling. The German police took reports documenting Nahrvani's various complaints. Nahrvani admitted that he did not give the police the names of any sus-

pects because he did not know any specific names. In addition, Nahrvani's assertion is directly contradicted by the testimony of his wife, who stated that the police investigated the complaints, but were ultimately unable to solve the crimes. She also testified that racial issues in no way affected the police's willingness to help Nahrvani. The evidence simply does not compel the conclusion that the German government was unable or unwilling to control those individuals harassing Nahrvani.

Although Nahrvani's fear of returning to Germany is sufficiently credible, to satisfy the subjective component of the future persecution inquiry, the evidence must also compel a finding that future persecution is an objectively reasonable possibility.[4] *See Hoxha*, 319 F.3d at 1182.

**[8]** For many of the same reasons discussed above, Nahrvani's fear of future persecution in Germany is too speculative to support an asylum claim. *See Nagoulko v. INS*, 333 F.3d 1012, 1018 (9th Cir. 2003) (declining to credit a speculative future persecution claim). Nahrvani did not substantiate his claim regarding the German government's inability or unwillingness to control the asserted persecution from which he suffered. Thus, the evidence does not compel a finding that future persecution is an objectively reasonable possibility. *See id.*

**[9]** Because Nahrvani failed to establish eligibility for asylum from Germany, he necessarily failed to demonstrate eligibility for withholding of removal. *See Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003). Finally, substantial evidence supports the IJ's denial for relief under the CAT, as Nahrvani has presented no evidence to demonstrate that it is more likely

---

[4]Because Nahrvani cannot establish past persecution, he does not receive the benefit of a rebuttable presumption that his fear of future persecution was well-founded. *See Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002).

than not that he will be tortured if returned to Germany. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1193-94 (9th Cir. 2003).

## IV.

### *THE BIA's SUMMARY AFFIRMANCE*

We need not address Nahrvani's argument that the BIA improperly streamlined his case pursuant to 8 C.F.R. § 1003.1(a)(7)(ii). Because we reached the merits of the IJ's decision, it is "unnecessary and duplicative" for us to review the BIA's decision to streamline. *Falcon Carriche*, 350 F.3d at 855.

## V.

### *CONCLUSION*

Substantial evidence supports the IJ's conclusion that Nahrvani was firmly resettled in Germany and thus ineligible for asylum from Iran. Substantial evidence also supports the IJ's conclusion that Nahrvani is not entitled to asylum, withholding of removal, or CAT relief from Germany. The petition is DENIED.

---

B. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent from the denial of eligibility for asylum. The record compels a finding that Nahrvani experienced past persecution on account of his political opinion and religion and reasonably fears future persecution if he is returned to Germany or Iran. Nahrvani was granted asylum in Germany because of his persecution in Iran. Although Nahrvani felt safe in Germany for some time, that safety was compromised when the Iranian government discovered Nahrvani's whereabouts. Iranian agents recommenced a campaign of per-

secution against Nahrvani, and the German government was unwilling or unable to control them.

The IJ found Nahrvani's testimony regarding events in both Iran and Germany to be credible. Specifically, the IJ found that Nahrvani was "forthright and . . . sufficiently detailed and consistent in light of the general conditions, not only in his country of Iran but in his country of Germany as well."

Because the IJ found Nahrvani credible, no one disputes that Nahrvani satisfied the subjective component of the well-founded fear test. Similarly, there is no dispute that the Iranian government acted against Nahrvani on the basis of a statutorily protected ground.

My disagreement with the majority arises on two grounds. First, although the IJ did not expressly address the question of whether the Iranian government's actions against Nahrvani in Germany constituted past persecution, the majority finds that they did not. As a result, the majority concludes that Nahrvani failed to show that his fear of future persecution in Germany is objectively reasonable. However, Nahrvani's credible testimony and corroborating evidence compel a finding of past persecution in Germany. This would shift the burden to the government to rebut the presumption of a well-founded fear of future persecution.

Second, the IJ expressly denied asylum on the ground that Nahrvani failed to demonstrate that the acts of which he complains were "committed by the government or forces the government is either unable or unwilling to control," and the majority agrees. However, this conclusion is not supported by substantial evidence.

## I.  Facts

Nahrvani credibly and specifically testified to the following facts. Nahrvani's father was a high-ranking official during the

Shah's regime. Nahrvani, his father, and his siblings actively opposed the current Iranian regime after it assumed power. Nahrvani distributed political literature and cooperated with student activists. Nahrvani and his brother were arrested at a political demonstration and imprisoned for two years without a trial. During his imprisonment, Nahrvani was tortured and forced to watch the executions of fellow prisoners while being warned that "his turn" would come soon. Nahrvani and his brother escaped from prison with their father's aid and fled to Germany, where they were granted asylum.

In Germany, Nahrvani married a prominent Christian pastor and converted to Christianity. When he became eligible to become a German citizen, he learned that the German government required him present himself to the Iranian Consulate and renounce his Iranian citizenship as a prerequisite to naturalization. Nahrvani protested. He feared that announcing his presence to the Iranian Consulate would expose him to additional persecution — and this fear ultimately proved to be well-founded.

Nahrvani explained to the German authorities that renouncing his citizenship would endanger him because a) doing so would announce his presence to the Iranian government and enable the Iranian government to track his whereabouts, and b) his political and religious background made him a likely target for persecution by the Iranian government. The German government nonetheless insisted that Nahrvani go to the Iranian Consulate to renounce his citizenship. As Nahrvani predicted, this act immediately caused the Iranian government to reinitiate its persecution of him, this time in Germany.

When Nahrvani went to the Iranian Consulate to renounce his citizenship, he was required to fill out forms and answer questions that provided the Iranian government with information regarding his address of residence, his marriage to a prominent German pastor, and his conversion to Christianity. After he submitted his forms, the Iranian Consulate kept him

waiting for hours and then interrogated him regarding his reasons for renouncing his Iranian citizenship and his religious conversion. After the Consulate officials realized that he was a political asylee and a Muslim who had converted to Christianity, they ordered him to leave the Consulate. The Consulate never processed his renunciation; instead, they began what the IJ described in his findings as a "reign of terror."

According to an expert's declaration, the information that Nahrvani provided by filling out the citizenship renunciation forms was most likely transmitted from the Iranian Consulate to the central Iranian government in Iran. In addition, this expert explained that the information on the citizenship-renunciation forms gave the Iranian government several different reasons to target Nahrvani for persecution. First, Nahrvani is an escaped political prisoner whose family actively opposes the current Iranian regime. Second, he made an asylum claim against Iran which is an act considered by the Iranian government to be "counter-revolutionary" and defamatory of the State of Iran. Third, he is a Muslim who has converted to Christianity. The Iranian government's position is that Muslims who convert to Christianity should be sentenced to death, and Iran has actually executed a number of individuals on that basis. The prominence of Nahrvani's German wife, who has a weekly television show, heightens the risk that Nahrvani would be rediscovered and targeted again if he is returned to Germany.

The "reign of terror" that the Iranian government waged against Nahrvani in Germany included multiple death threats accompanied by acts of vandalism that escalated in severity over time. First, his bicycle tires were slashed, then his car window was smashed with a rock, then the tires of both his car and his wife's car were slashed, then his brother's car's tires were slashed as well. At first, notes accompanying acts of vandalism asked, "Isn't that enough?" As time went on, the death threats became more specific and severe. For example, he was told, "It is Halal to shed your blood." Another note

explained that no punishment is enough for Muslims who have converted to Christianity and that such people "must die." These death threats were repeated in multiple phone calls and notes. Nahrvani also noted several times that he was chased by the Iranian Secret Police.

Nahrvani testified that when he reported the first of these incidents to the police, the police discouraged him from naming the Iranian Consulate in his complaint, advising him that doing so would be "very costly" to him. As the campaign of harassment continued, Nahrvani continued to file complaints with the police. Although the police took notes, Nahrvani saw no evidence of further investigation, and the campaign of harassment continued unabated.

Although Nahrvani's credible testimony is sufficient to establish these facts without corroboration, the IJ noted that "[Nahrvani's] statements regarding his experiences with Muslim fundamentalists in both Iran and Germany are corroborated by the State Department reports." In addition, Nahrvani's testimony was corroborated by his wife's testimony, police reports, news articles, and expert declarations and reports.

Nahrvani also testified and provided corroborative evidence regarding the Iranian government's pattern and practice of denouncing, monitoring, attacking, and even killing Iranian exiles living in Germany and other European nations. Nahrvani provided similar evidence documenting the Iranian government's persecution of — and execution of — Iranian Muslims who convert to Christianity.

## II.  Analysis

The majority's treatment of the Iranian government's campaign of terror against Nahrvani does not comport with settled principles of immigration law.

## A. Death Threats

"We have consistently held that death threats alone can constitute persecution." *Navas v. INS*, 217 F.3d 646, 658 (9th Cir. 2000); *see also Khup v. Ashcroft*, 376 F.3d 898, 903 (9th Cir. 2004); *Del Carmen Molina v. INS*, 170 F.3d 1247 (9th Cir. 1999); *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir. 1998); *Gonzales-Neyra v. INS*, 122 F.3d 1293, 1296 (9th Cir. 1997); *Gonzalez v. INS*, 82 F.3d 903 (9th Cir. 1996); *Gomez-Saballos v. INS*, 79 F.3d 912 (9th Cir.1996); *Aguilera-Cota v. INS*, 914 F.2d 1375 (9th Cir. 1990).

The majority concludes that the death threats against Nahrvani "were too vague to constitute persecution." However, death threats such as "It is Halal to shed your blood" and "People who leave Islam have to die" are clearly specific and menacing. The IJ himself noted that "[Nahrvani] has suffered from threats of imminent death for a prolonged period of time."

The majority also argues that, while "death threats against an individual may be sufficient to constitute persecution," the threats made against Nahrvani were not surrounded by events that are sufficient to support a finding that the death threats constitute persecution. While I agree that the death threats must be viewed in context, I find that an examination of the death threats against Nahrvani in their surrounding context compels a conclusion exactly opposite from the majority's.

First, "[w]e have repeatedly held that threats may be compelling evidence of past persecution, particularly when they are specific and menacing and are accompanied by evidence of violent confrontations, near-confrontations and vandalism." *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004). Here, in addition to being "menacing and specific," the multiple death threats against Nahrvani were accompanied by near-

confrontations and escalating acts of vandalism to Nahrvani's property, as well as his wife's and his brother's property.[1]

Second, when determining whether multiple death threats and incidents of harassment and vandalism constitute persecution, we view them cumulatively. *Mashiri*, 383 F.3d at 1120-21; *Surita v. INS*, 95 F.3d 814, 819 (9th Cir. 1996). Here, the death threats made against Nahrvani were repeated many times, and they escalated in severity over time.

Third, "[w]e have found that the severity of harm is compounded when incidents of persecution have occurred on more than one occasion, particularly where an applicant is victimized at different times over a period of years." *Baballah v. Ashcroft*, 367 F.3d 1067, 1076 (9th Cir. 2004) (internal quotation and citation omitted); *see also Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1075 (9th Cir. 2004) (finding it improper for the IJ to treat the petitioner's personal experiences "as if they had occurred in a vacuum," even though the petitioner's personal experiences of persecution occurred a decade apart). Here, the government responsible for the death threats and violent acts in Germany is the same government that imprisoned and tortured Nahrvani and his brother in the past — namely, the Iranian government.

Fourth, the death threats against Narhvani do not appear "hollow" when viewed in light of the evidence documenting the number of times the Iranian government has murdered Iranian exiles residing in European nations, including Germany; these murders demonstrate both the Iranian government's ability and its willingness to carry out its threats against Iranian asylees in Europe. Similarly, the death threats must be taken much more seriously when viewed in light of the evidence that the Iranian government views Muslims who con-

---

[1]We have recognized that "evidence of harm to [a p]etitioner's family supports a finding of past persecution." *Salazar-Paucar v. INS*, 281 F.3d 1069, 1075 (9th Cir. 2002).

vert to Christianity as deserving of death sentences and has executed individuals on that basis. Where, as here, context indicates that a death threat against an asylum-seeker is "much more than an idle threat," we have found that the death threat constitutes persecution. *Mashiri*, 383 F.3d at 1120; *see also Korablina v. INS*, 158 F.3d 1038, 1045 (9th Cir. 1998) (holding that where "evidence of a specific threat on an alien's life . . . is presented in conjunction with evidence of political and social turmoil, the alien has succeeded in establishing a prima facie eligibility for asylum").

In concluding that Nahrvani did not establish eligibility for asylum, the majority likens this case to *Hoxha v. Ashcroft*, 319 F.3d 1179 (9th Cir. 2003), and *Lim v. INS*, 224 F.3d 929 (9th Cir. 2000). In both *Hoxha* and *Lim*, we found that the threats experienced by the applicant did not rise to the level of persecution. However, these cases are clearly distinguishable. Unlike Nahrvani, Hoxha had no prior experience of persecution by the group that was threatening him, the single threat was unaccompanied by any other acts, and the threat was not repeated over time. Although Lim received multiple death threats, he had never been attacked or physically harmed by those making threats against him; in contrast, Nahrvani has been imprisoned and tortured by agents of the Iranian government in the past.

In sum, Nahrvani's previous experience of political imprisonment and torture at the hands of the Iranian government, the Iranian government's pattern and practice of pursuing Iranians living overseas, and the escalating pattern of harassment and vandalism in Germany, make the death threats against Nahrvani much more than "hollow and uniformly unpleasant," as the majority suggests. Given these facts, the specific and menacing death threats made against Nahrvani are compelling evidence of persecution.

## B.  *Psychological and Emotional Trauma*

In *Kovac v. INS*, 407 F.2d 102, 105-07 (9th Cir. 1969), we explained that persecution requires harm or suffering, but not

necessarily *physical* harm. *See also Mashiri*, 383 F.3d at 1120 (discussing the infliction of emotional or psychological trauma as a form of persecution); *Khup*, 376 F.3d at 903 ("'persecution' is not limited to physical suffering"); *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2004) (noting, *inter alia*, that persecution may come in the form of threats, harassment, or mental, emotional, and psychological harm); *Li v. INS*, 92 F.3d 985, 987 (9th Cir. 1996) (noting that "an arrest of a family member at a church may provide the basis for past persecution of petitioner's family on account of religion"); *Kahssai v. INS*, 16 F.3d 323, 329 (9th Cir. 1994) (per curiam) (Reinhardt, J., concurring) ("The fact that [petitioner] did not suffer physical harm is not determinative of her claim of persecution: there are other equally serious forms of injury that result from persecution.").

Here, Nahrvani has suffered from severe persecution, including physical torture, at the hands of the Iranian government. When the Iranian government began making death threats and committing acts of vandalism against Nahrvani and his family in Germany, it was not doing so in a vacuum; rather, the Iranian government's acts against Nahrvani in Germany represent a re-initiation of a campaign of terror from which Nahrvani had narrowly escaped. As a result, we cannot assume that the death threats, vandalism, and harassment made no greater impact on Nahrvani than similar incidents would have made on an individual who had never been imprisoned and tortured previously. Narhvani experienced these threats not only as a survivor of torture and imprisonment, but also in the context of numerous reports of Iranian state-sponsored violence, including murders, against Iranian political exiles living in Europe and against Iranian Christians. These facts are compelling evidence that the Iranian government subjected Narhvani in Germany to psychological and emotional trauma that rises to the level of persecution.

In sum, taking together a) the death threats, repeated harassment, near-confrontations, and multiple and escalating

acts of physical vandalism by Iranian government agents in Germany; b) the past physical torture and imprisonment of Narhvani by agents of the same government in Iran; c) the Iranian government's pattern and practice of violence against Iranian exiles residing in Europe generally, and Germany in particular; d) the Iranian government's pattern and practice of persecuting and executing Muslims who convert to Christianity; and e) Nahrvani's membership in multiple groups that the Iranian government strongly disfavors, I am compelled to conclude that Nahrvani suffered persecution in Germany.

### C. Inability or Unwillingness to Control Nongovernmental Forces

It is well-established that, for the purposes of asylum eligibility, persecution can be perpetrated by either governmental forces or "nongovernmental groups . . . which the government is unable or unwilling to control." *Navas*, 217 F.3d at 656 n.10 (internal quotation and citations omitted); *see also Avetova-Elisseva v. INS*, 213 F.3d 1192, 1197-98 (9th Cir. 2000); *Singh v. INS*, 94 F.3d 1353, 1360 (9th Cir. 1996).

To meet this requirement, Nahrvani need not show that the government actually encouraged or aided the nongovernmental forces.[2] As we explained in *Navas*, "[g]overnment action is not necessarily required; instead, police inaction in the face of such persecution can suffice to make out a claim." *Navas*, 217 F.3d at 656 n.10 (internal citations omitted).

The majority adopts the IJ's conclusion that Nahrvani is not eligible for asylum because he failed to show that the acts of which he complains were committed by such forces; however, this conclusion is not supported by substantial evidence.

---

[2]In this case, the agents of persecution are technically governmental, but because they are Iranian governmental forces acting extra-territorially in Germany, for the purpose of determining whether Nahrvani is eligible for asylum from Germany, I treat the Iranian government agents as "nongovernmental."

Indeed, the IJ found that "[Nahrvani and his wife] reported [the] incidents to the police and *the police were able to do very little to stop this particular reign of terror.*" This finding of fact directly contradicts the IJ's conclusion that "it has not been established that the German government is unwilling or unable to protect the respondent from any of the harms made or threatened against him."

The German police's inability to stop the persecution of Nahrvani is sufficient to support Nahrvani's claim. It is enough to show that the government is unable to control non-governmental forces of persecution, as opposed to unable *and* unwilling. *See, e.g., Avetova-Elisseva*, 213 F.3d at 1198 ("It does not matter that financial considerations may account for [the government's] inability to stop elements of ethnic persecution. What matters instead is that the government is unwilling or *unable* to control those elements of its society committing the acts of persecution." (internal quotation and citation omitted) (emphasis in original)).

Although it is not necessary for Nahrvani to show that the police were unable *and* unwilling to control the Iranian agents, Nahrvani need not rest solely on the inability-to-control concept, for there is also evidence that the German police were unwilling to investigate Nahrvani's claims. When Nahrvani first went to the police, the police actually discouraged him from naming the Iranian Consulate in his complaint, advising him that doing so would be "very costly" to him. Nahrvani nonetheless insisted on filing a complaint. According to both Nahrvani and his wife, Karen Boye, the police responded by trivializing and ignoring his claims. According to Boye, after Nahrvani's car was severely damaged, the police continued to treat the case "as if it[ was an] everyday crime . . . or maybe like . . . [a] feud . . . among ethnic groups, problems which they have with each other." While Nahrvani's wife testified that the police seemed to take Nahrvani's complaints more seriously after she became

involved, she also testified that this change in attitude produced no better results.

Thus, the testimony of both Nahrvani and his wife should compel us to conclude that the German police were either unable or unwilling to respond adequately to Nahrvani's complaints. There is no evidence that the German police ever tried to control, much less succeeded in controlling, the Iranian agents.

The majority attempts to find support for its contrary conclusion in the testimony of Nahrvani's wife, asserting that Boye testified that the German police investigated Nahrvani's complaints. This statement substantially misrepresents Boye's testimony. Boye consistently explained that she thought the police either did nothing or couldn't do anything in response to Nahrvani's complaints. The only statements Boye made that could be construed as testimony that the German police investigated were purely conjectural, as she herself admitted at the time. For example, after expressing her desire to maintain faith in the German police, Boye conjectured that the police could have investigated without her knowledge. Nonetheless, she went on to reiterate that it appeared to her that the police did nothing to investigate or apprehend the perpetrators. Specifically, Boye testified that each time she and her husband filed a complaint, within a couple weeks, the police sent them a "receipt" that simply noted that the police "worked on [the case] but . . . couldn't clear who it was." Boye also testified that even after she utilized personal connections to command the attention of the police, "[the police] thought about it, but they couldn't do anything against it, so we saw no help. If I would have seen any help . . . I wouldn't let [Nahrvani] go [to the United States]." Especially in light of the police's initial attempt to discourage Nahrvani from even lodging a complaint, the brevity of the investigatory periods and the form receipts indicate that the police made less than adequate investigations.

Even if we were permitted to assume that the German police made *some* investigation into Nahrvani's complaints, because the record shows that the police attempted to discourage Nahrvani from filing a complaint and closed any investigation very quickly without producing any results (no arrests were made and the campaign of harassment continued unabated), we would still be compelled to conclude the German government was unable to control the Iranian agents. In *Mashiri*, we held that an applicant seeking asylum from Germany demonstrated that the German police were unable or unwilling to control nongovernmental forces where, as here, the "police made no arrests . . . [and] quickly closed their investigation after treating the attack on the [petitioner's] apartment as [a common crime], despite evidence that the attack was motivated by . . . hatred." *Mashiri*, 383 F.3d at 1121-22; *see also Chitay-Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999) (finding that the government was unable or unwilling to control nongovernmental forces where the government detained but quickly released suspects). In *Navas*, we held that "arrests by police, without more, may not be sufficient to rebut claims that the government is unable or unwilling to stop persecutors . . . ." *Navas*, 217 F.3d at 656 n.10 (internal citations omitted). Here, the police failed to make even a single arrest.

The majority also notes that Nahrvani failed to provide the German police with the specific names of the agents who were persecuting him. However, this fact is irrelevant to our analysis. In *Singh*, we commented on the fact that the police failed to respond to complaints even though Singh identified his assailants by name; however, we did not hold then — and we have never held since — that in order to demonstrate inability or unwillingness of the government to control nongovernmental forces of persecution, an asylum applicant must prove that he not only went to the police but also provided the police with the exact names of his attackers. *See Singh*, 94

F.3d at 1360. Indeed, such a requirement would make little sense given the nature of this persecution.[3]

Although Nahrvani's credible testimony, especially as corroborated by his wife's testimony, is sufficient to establish the German government's inability or unwillingness to stop the campaign of harassment, Nahrvani also provided evidence that Iranian government agents have committed acts of violence against similarly situated individuals in Germany and have not been prosecuted. In *Gomez-Saballos v. INS*, we held that documentary evidence about a general pattern of persecution against similarly situated individuals reasonably supports a contention that the government is unable to control the forces behind that persecution. *See Gomez-Saballos v. INS*, 79 F.3d 912, 916-17 (9th Cir. 1996). The fact that there has been one prosecution of Iranian government agents for the assassination of Iranian exiles in Germany is not dispositive, for where, as here, it appears "that the perpetrators of crimes . . . escape more often than not," *Surita v. INS*, 95 F.3d 814, 817 (9th Cir. 1996) (internal quotation and citation omitted), evidence of a single prosecution does not compel a finding of governmental ability or willingness to control.[4]

---

[3]This case is not one in which the asylum applicant failed to report incidents to or cooperate with the government. Nahrvani promptly reported incidents to the police and continued to do so even after the police discouraged him and proved ineffective at stopping the threats and harassment. He also described the perpetrators, reported that they were associated with the Iranian Consulate, and furnished the threatening notes.

[4]It is telling that the record establishes that the German government revoked its policy of requiring Iranian asylees seeking to become German citizens to officially renounce their Iranian citizenship after Nahrvani had already fled from Germany to the United States. This change in policy suggests the German government itself recognizes that the policy endangered Iranian asylees living in Germany and that the German government was not certain that it could protect Iranian asylees from being harmed by the Iranian government if it continued the policy. For Nahrvani, unfortunately, this genie was already out of the bottle.

In sum, Nahrvani demonstrated that the German government was either unwilling or unable to stop the Iranian government's campaign of death threats, vandalism, and harassment against him, and the IJ's contrary conclusion is not supported by substantial evidence.[5]

\* \* \* \* \*

We must step back to look at Nahrvani's persecution, not just as his Iranian experience, or his German experience, but as a complete picture. After two years imprisonment and torture in Iran, this man knows what the Iranian government can and will do to him. Understandably, escalating death threats and escalating physical damage in Germany were frightening to him and his wife. They expected worse would follow. Reluctantly, his wife decided separation was better than risking the assassination of her husband.

For these reasons, I would find Nahrvani eligible for asylum and would remand for the attorney general to exercise discretion as to its grant.

---

[5]There is also a troubling side issue in this case: it is not clear what will happen to Nahrvani if he is removed to Germany. Nahrvani and his wife both testified that Nahrvani, as an asylee, was not supposed to leave Germany for more than three months, that he has remained in the United States beyond that time, and that his German passport has expired. Thus, it is not clear that the German government will permit him to re-enter Germany, and it is possible that the German government would return him instead to Iran. Meanwhile, the IJ concluded, and the record substantially supports his conclusion, that if Nahrvani is forced to return to Iran, he not only faces a clear probability of persecution, but also is more likely than not to be tortured. Indeed, the IJ suggests that Nahrvani would likely be put to death by the Iranian government.