**Valeriu MATEPA; et al., Petitioners,**

v.

**Michael B. MUKASEY, Attorney General, Respondent.**

No. 06–70044.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 2008.

Filed June 18, 2008.

---

Teresa A. Statler, Portland, OR, for Petitioners.

District Counsel, Office of the Chief Counsel/Ice Department of Homeland Security, Kelly A. Zusman, Mark O. Hatfield U.S. Courthouse, Portland, OR, Ronald E. Lefevre, Office of the District Counsel, Department of Homeland Security, San Francisco, CA, for Respondent.

Before: TALLMAN and CLIFTON, Circuit Judges, and CARROLL *, Senior United States District Judge.

## MEMORANDUM **

Valeriu and Maria Matepa, and their children Elena and Ivan, all of whom are citizens of Moldova, petition for review of the order of the Board of Immigration Appeals dismissing their appeal from an Immigration Judge's decision denying their applications for asylum and withholding of removal. We deny the petition.

Valeriu Matepa is of Ukranian ethnicity and the Matepa family's primary language is Russian. The Matepas' asylum claim rests on their allegations that they were persecuted in Moldova on account of their nationality. They contend that the IJ applied the incorrect legal standard in deciding whether the evidence demonstrated that the Moldovan government played a sufficient role in the family's persecution. The Matepas argue that the IJ erroneously required them to establish complicity on the part of the Moldovan police.

We have held that "affirmative state action is not necessary to establish a well-founded fear of persecution if the government is unwilling or unable to control

---

* The Honorable Earl H. Carroll, Senior United States District Judge, District of Arizona, sitting by designation.

** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

those elements of its society responsible for targeting a particular class of individuals." *Avetova–Elisseva v. I.N.S.*, 213 F.3d 1192, 1196 (9th Cir.2000) (internal quotations and citations omitted). In the present case, the IJ recited and properly applied precisely this standard and concluded that "there is not evidence sufficient to show that the Moldovan government is unable or unwilling to protect ethnic Russian speakers from harassment or persecution[.]" The IJ did not require the Matepas to provide evidence of government complicity.

The Matepas also contend that substantial evidence does not support the IJ's determination that the Moldovan government was not unable or unwilling to control the individuals who harmed them, but they have failed to show that the evidence compels a contrary conclusion. *See Gu v. Gonzales*, 454 F.3d 1014, 1018 (9th Cir. 2006) (discussing how our review of such determinations is "highly deferential"). The Matepas reported three instances of claimed persecution to police: (1) Valeriu Matepa's former co-workers beat him after he refused to buy them drinks; (2) one in a group of intoxicated youths kicked Elena Matepa in the back as the Matepa family was exiting a bus; and (3) the Matepas' mailbox was burned and a neighbor threw a rock at their window.

After the first incident, Valeriu Matepa went to the police, who stated that they were aware of what happened but advised Valeriu that his report would likely not lead to any arrests because one of his assailants was the father of a police officer. Although this is an unfortunate example of police bias and inaction, it is insufficient, standing alone, to demonstrate that the Moldovan government is generally unwilling to control private actors who might persecute ethnic minorities, and it is completely unrelated to the other instances of purported persecution and police complacency.

When someone kicked Elena Matepa and she fell on the pavement, the police responded promptly, apprehended and questioned the men responsible, and asked Valeriu Matepa what he wanted them to do. The police did decline to accompany or transport Elena to the hospital, but the record does not show that Elena's injuries were so serious as to necessitate emergency transport, and the officers' failure to provide such transport does nothing to show that they were unwilling or unable to "control" Elena's attackers.

Finally, with respect to the third incident, after the Matepas reported the damage to their home, the police responded and completed a report. The Matepas left Moldova shortly afterward, however, before the police had an opportunity to take any substantive action. Accordingly, there is no evidence that the police would have failed to prevent further destruction or to punish those responsible. In addition, there is nothing in the 2003 Country Report to support the Matepas' allegations that Moldovan police are ineffective at controlling private actors who have engaged in violence against Russian speakers or those of Ukranian ethnicity.

■ The Matepas have failed to establish that the evidence compels the conclusion that the acts of which they complain "were committed by the government or forces the government is either unable or unwilling to control." *Nahrvani v. Gonzales*, 399 F.3d 1148, 1154 (9th Cir.2005) (internal quotations omitted). They have therefore failed to demonstrate that they experienced past persecution or that they have an objectively reasonable, well-founded fear of future persecution. As a result, they are ineligible for asylum or withholding from removal. *Id.* at 1154 (holding that, because the petitioner failed to estab-

lish eligibility for asylum, "he necessarily failed to demonstrate eligibility for withholding of removal") (citing *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir.2003)).

**PETITION FOR REVIEW DENIED.**

CARROLL, District Judge, dissenting:

I respectfully dissent. Despite several credible incidents of persecution, none of which resulted in police protection from— or prosecution of—the wrongdoers, the Immigration Judge ("IJ") and Board of Immigration Appeals ("BIA") determined that the Matepa family had not suffered past persecution and the Moldovan[1] government was willing to protect them and other Russian speakers from future persecution.[2] These conclusions are not supported by substantial evidence in the record. *See Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir.2004).

We look at the totality of the circumstances in deciding whether a finding of persecution is compelled.[3] *See Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir.

2004) (citing *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir.1998) ("The key question is whether, looking at the cumulative effect of all the incidents a petitioner has suffered, the treatment [he or] she received rises to the level of persecution.")). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Turcios v. INS*, 821 F.2d 1396, 1398 (9th Cir.1987).

The incidents suffered by the Matepas compel by substantial evidence a finding of past persecution, entitling the Matepas to a presumption of well-founded fear of future persecution. *See Guo*, 361 F.3d at 1203 (holding that IJ's finding that petitioner did not suffer past persecution was not supported by substantial evidence). In April 2000, the Matepas were on a bus speaking Russian. As they were exiting, a Moldovan man who had told them to speak Moldovan, pushed Elena—who was only 12 years-old at the time—out of the bus with his foot. Elena fell down and hit her chest

---

**1.** The small country of Moldova, located on the Black Sea, was a republic in the former Soviet Union ("USSR"). The country has historically been part Romanian and part Russian, united by force under the Soviets to form one country, but not one people. When the USSR dissolved, Moldova became an independent state. In 1992, the country experienced an ethnic war brought on by tensions in the Russian-speaking regions between Russians and ethnic Moldovans (or Romanians). In 2001, Vladamir Voronin, a Russian, was elected President. In January 2002, Voronin and his regime announced plans to make Russian an official language and compulsory in schools. The move sparked months of mass protests, which ended only when the proposal was withdrawn.

**2.** An alien seeking asylum based on past persecution must show that he was harmed on account of his race, religion, nationality, membership in a particular social group, or political opinion. *Montoya–Ulloa v. INS*, 79 F.3d 930, 931 (9th Cir.1996); 8 U.S.C.

§ 1101(a)(42)(A). The Matepa family consists of father and husband Valeriu, wife and mother Maria, and minor children Elena and Ivan. Mr. Matepa is of Ukranian ethnicity. Mr. Matepas marriage to Maria, who is Moldovan, renders their marriage "mixed" in their country. Russian is her preferred language, which she was required to learn when Moldova was a Russian state. Mr. Matepa speaks Moldovan, but with a heavy accent. His primary language is Russian.

**3.** The standard of review noted by the majority allows a reversal of the BIA's determination when it is clear that a reasonable fact finder would be compelled to conclude that the alien has a well-founded fear of persecution. The only authority for this proposition is a footnote in *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). There is no reasoned opinion which supports the proposition that an appeals court can only reverse when it is compelled to do so.

on "the border stone." The Moldovan police pulled aside the perpetrators and talked to them. The police asked Mr. Matepa what he wanted them to do. Elena was injured and Mr. Matepa asked the police to help transport her to the doctor's office, but they refused, explaining that "they had some more important things to attend" to. Mr. Matepa hailed a taxi cab and took Elena to the doctor's office; she suffered chest injuries, had difficulty breathing, and had bruises on her chest and arm. When the IJ asked why Mr. Matepa did not file a police report, he testified that it was clear to him from the police's earlier statements that they would not do anything to the perpetrators.

In August 2000, Mr. Matepa was beaten and thrown into a sewer hole by several of his former Moldovan coworkers, who told him that he did not "have any right to be in [the] country." Mr. Matepa lost consciousness and came to inside the dark sewer hole. He began yelling for help, but no one came to his aid. He managed to crawl out and get himself home that night. An ambulance was called and he was treated initially at his home but told to see the doctor in the morning. He went to the doctor the next morning and received further treatment. The doctor advised Mr. Matepa to file a police report and that the hospital would also inform the police. Mr. Matepa suffered leg injuries, an infection, and bruises all over his body. When Mr. Matepa went to the police station, an officer told him that the incident had already been reported by the hospital. The officer told Mr. Matepa that his case would not "go any further than this police station." Mr. Matepa asked why and the officer stated that one of the men who beat him

up had a son who worked for the police. The officer explained that "even if somebody were to push that report further up, nobody would really consider" it.

In late 2001, the Matepas' Moldovan neighbor threw a rock through the Matepas' window after the family had returned from Ukraine, where they had relocated for nine months.[4] Mr. Matepa reported the incident to the police, who wrote up a report but otherwise took no action against the neighbor. Around the same time, the Matepas' mailbox was burned and the Matepas suspected it was the same Moldovan neighbor based on conversations they overheard.

In February 2002, Mr. Matepa was working as a driver for a company official. One day Mr. Matepa stopped at a gas station to refuel the car. When he was waiting in line, a driver cut in front of him. Mr. Matepa got out of his car. Other drivers waiting in line were complaining that the man had cut the line. Mr. Matepa, speaking Russian, asked the man why he cut in line. The man filled his tank and drove away, running his car into Mr. Matepa as he stood next to his car. Mr. Matepa fell to the ground. The man looked out of his car window and told Mr. Matepa "that's what's awaiting everybody who is going to talk to him in … a language unknown to him." Mr. Matepa suffered light bruises in the incident. After returning home, he and his wife discussed the need to make changes in their lives to avoid similarly dangerous situations.

Also in February 2002, Mrs. Matepa was asked by Elena's school teacher to sign a parents' petition against the proposal to make Russian an official language. Mrs. Matepa told the teacher that she would not

4. The Matepas moved to the Ukraine at the end of February 2001, and remained there until November 2001. They had hoped to build a better life there but because they lacked legal papers, obtaining legitimate employment and enrolling the children in school was impossible.

sign such a petition and that her family had already been having a lot of problems because they spoke Russian. The teacher became very upset and told Mrs. Matepa that if the law eventually passed, Elena would be transferred to another school.

In remand proceedings before the IJ, Mr. Matepa's cousin, Vladamir Odumchuck, provided corroborating testimony regarding persecution and police inaction. While living in the Matepas' Moldova residence after the family had moved to the United States, he received almost daily telephone calls for about a year threatening him and the Matepa family. At first, the unidentified callers would spout ethnic slurs and tell Mr. Odumchuck to tell the Matepas not to return to Moldova. The callers threatened to "eliminate the family" and implied that they could make the family "get in a terrible accident." The callers later identified themselves by first names, and Mr. Odumchuck went to the police to report the suspects' statements. They told him they could not help him. Mr. Odumchuck submitted a written statement, nonetheless. At some point, the police recorded one of the threatening calls but told Mr. Odumchuck that it was not evidence and took no further action. Mr. Odumchuck never received a copy of the recording.

Based on the incidents described, there is substantial evidence that the Moldovan government was unwilling to protect the Matepa family. The IJ and the majority rely on an *absence* of corroborating evidence in the Moldova country reports.[5] I do not find that the absence of evidence in the country reports overcomes the otherwise credible and compelling evidence presented by the Matepas. To the contrary, there is overwhelming evidence that when the Matepas did seek the assistance of the Moldovan police, they received no assistance. The IJ found that if the Matepas' claims could "be attributed to groups, primarily which would be ethnic Moldovans, which the government is unwilling or unable to control, then it would appear that ... the background would rise to the level of past persecution...." That finding is compelled by the evidence in the record, yet the IJ failed to make a finding of past persecution. While the police often listened to the Matepa's complaints, they took no action to protect them from future persecution. The Matepas' descriptions of events were corroborated by Mr. Odumchuck's descriptions of persecution and police inaction.[6]

Because I would conclude that the Matepas presented substantial evidence that they were persecuted in Moldova because of their speaking Russian, they are presumed to have a well-founded fear of future persecution if forced to return to Moldova. *See Guo,* 361 F.3d at 1204; 8 C.F.R. § 208.13(b)(1). Thus, the burden shifts to the Government to show by a preponder-

---

**5.** The IJ cited to an Amnesty International Report. The IJ stated that the "background documents ... appear to point to that *[sic]* there are ethnic tensions, there is a particular ethnic tension on the part of the ethnic Moldovans relating to Romania who fear being imposed apparently with the ties to Russia or matter of Russian and there that tension." The Amnesty International report, however, contained corroborating evidence that in 2001, people who lodged complaints were victims of "harassment" at the hands of the Moldovan police. The IJ also cited a country report from 2003, which did "not give any indication that there is any stated policy or practice on the part of the Moldovan government officials to harass or discriminate against ethnic Russian speakers, Ukranian or Russian and there is no suggestion that there is a de facto or silent policy of encouraging the same."

**6.** Mr. Odumchuck also testified that he would be moving to Russia to escape persecution and unfair treatment in Moldova.

ance of the evidence that conditions in Moldova have changed to such an extent that the Matepas no longer have a well-founded fear of persecution if returned. *Id.* The IJ and BIA did not reach this question. Therefore, I would remand this matter for a determination of whether the Government has presented sufficient evidence to rebut the presumption that the Matepas have an objectively well-founded fear of future persecution.[7] *Id.*

---

7. I would also order that all future hearings take place before a different IJ. The IJ who issued the final decision (after a remand) wavered in his assessment of the Matepas' credibility, ultimately finding them "generally credible" yet did not properly factor their credible evidence into his decision. The Matepas credibility is apparent from the record and circumstances. The family believed the persecution was severe enough to warrant leaving their home in Moldova to seek asylum in the United States. They traveled to New York via a circuitous route through Jamaica because they did not need visas to enter Jamaica from their country. Such decisions are not made lightly. Their fear in being forced to return to Moldova is evident and frightening.

